33 So.2d 164

**PARSONS v. STATE.**

**6 Div. 594.**

Court of Appeals of Alabama.

Dec. 23, 1947.

310

Beddow & Jones, of Birmingham, for appellant.

A. A. Carmichael, Atty. Gen., and Bernard F. Sykes, Asst. Atty. Gen., for the State.

HARWOOD, Judge.

This is an appeal from a judgment of Hon. Alta L. King, one of the Judges of the Tenth Judicial Circuit of Alabama denying appellant's petition for a writ of habeas corpus and remanding him to jail without bond.

The appellant, who for convenience we shall hereinafter refer to as the petitioner, had at some date prior to this proceeding been arrested for robbery. He was thereafter bound over to the Grand Jury without bond in a preliminary hearing held before Hon. G. C. Boner, Judge of the Jefferson County Court of Misdemeanors. He then instituted this habeas corpus proceeding, and during its pendency the Grand Jury of Jefferson County returned an indictment against him for robbery. It was then agreed between both parties and the court that the issue under the proceedings was whether the petitioner was entitled to bail, and that all formal proceedings requisite in this proceeding be considered as met.

The evidence introduced by the State was directed toward showing that late on the afternoon of 30 October, 1947, Mary Arline Perry, 15 years of age, and her mother were alone in the Perry residence on Munger Drive, West End, in the city of Birmingham. Mrs. Perry was at the time confined to her bed by illness.

Hearing a knock on the front door Mary Arline admitted two men into the house. They asked if her father Mr. Perry was home. Upon being told he was not they asked if they might wait and were told they could. Mary Arline then started for the phone to call her father. One of the men, whom she later identified in a police line up as being John B. Baker, grabbed the phone out of her hand and both men pulled guns. Mary Arline identified this second man from photographs as being one Duncan. They then put handkerchiefs or masks on their faces and went into the room occupied by Mrs. Perry. They told Mrs. Perry that there was no need to worry, because of insurance, and then, according to Mary Arline "They asked where—did we have any guns—where did we keep—where did mother keep her money. They looked under the pillow, and they asked when was my daddy coming home, did he carry money with him, and did he carry a gun, did he have any diamonds on him and was anybody coming home with him?"

The two men then gagged both women, tied their hands, and forced Mary Arline to get in bed with her mother.

Shortly after this and at about 6:05 or 6:10 p.m. Mr. Perry entered his home. He had driven home in his automobile, a maroon colored Oldsmobile bearing a license number 58D-214, which he parked in front of his house. In the house Mr. Perry was met by a masked and armed man who greeted him with "this is a stick up." Mr. Perry replied he had no time for Halloween pranks and reached up to pull the mask off. When he did this he was hit from behind and knocked down. He was dragged into the room where his wife and daughter were, and there he was bound.

Both Mary Arline and Mr. Perry testified that they heard noises and talking in the other parts of the house indicating that some other person or persons than Baker and Duncan was, or were, also in the house.

Under threats Mr. Perry was forced to surrender his car keys and the keys to his store, and to disclose the combination of the safe in his jewelry store.

There was considerable conversation between the Perrys and the robbers and much pleading by the Perrys. In the course of searching the house, the robbers found some whiskey and took several drinks, and served Mr. Perry three drinks. Two of Mary Arline's girl friends called during this time, and being told by Mrs. Perry that their friends knew she was sick and that Mary Arline was with her, the robbers permitted Mary Arline to answer the phone and talk, but under gun point. Several phone calls also came for the robbers.

The man identified as Baker left the Perry home before the man Duncan.

After they had both gone Mary Arline worked loose from her fetters and ran to a neighbors for help. Neighbors arrived and released Mr. and Mrs. Perry.

When he went outside after his release Mr. Perry discovered that his automobile was gone. He next saw it that same night in the "police alley" in Birmingham.

At about 7 o'clock on this same evening Dr. and Mrs. John R. Argo parked their automobile parallel with the curb and nearly in front of the Perry Jewelry Company. They left the car, window shopped for a short while and then went to a nearby restaurant for dinner. One of the windows they observed while window shopping was that of the Perry Jewelry Company. At this time it contained the usual jewelry display found in such windows. They returned to their automobile about an hour later. At this time they noticed that the right hand window was practically empty, and the left hand window contained only costume jewelry.

After they had entered their car Mrs. Argo testified that another car pulled up along side theirs. At this point we will now quote from the record of Mrs. Argo's testimony:

"Q. Tell what that car did, if anything. A. Well, we thought he wanted our parking place. He pulled up to the car in front of us like he wanted to park, and then he blew his horn two times and—

"Q. Did you see — Did you get a look at the person who was in that car? A. Yes, I did.

"Q. Well, he had on a brown suit, and white gloves on his right hand. He had on a hat.

"Q. Now, did you look at the person? A. Yes, I saw his —

"Q. How long did he stay in that general vicinity there? A. A minute or two, nearly.

"Q. Now, after he stopped his car there, did you see anyone come out of the Perry Jewelry Store? A. Yes.

"Q. Well, describe that person. A. Well, he had very broad shoulders. I remember that more than anything.

"Q. Did you notice anything about his hands? A. He had on gloves, and he was carrying a bag in his left hand.

"Q. How large a bag was it, roughly speaking? A. It looked like a laundry bag for dirty towels. It was white.

"Q. What did that person do that came out of Perry's Jewelry Store with the bag in his hand? A. He got in his car.

"Q. Now, did you look at the license number of the automobile that came up beside of your car and blew the horn? A. Yes. I did.

"Q. What color car was that, if you remember? A. Dark red.

"Q. Did you write the license number down? A. Yes.

"Q. Did you keep the paper that you wrote it down on? A. It was in the glove compartment of Doctor's car.

"Q. I will ask you to look at that piece of paper. Examine both the front and back (handing paper to witness). A. This is it.

"Q. Is that the piece of paper? A. Yes, it is.

"Q. I will ask you if this number on the back is the number that you state that you wrote? A. Yes, sir. 58D-214."

The record shows that Mrs. Argo later identified the petitioner as the driver of the above car, being the same color and bearing the same license number as the car stolen from Perry, as being the petitioner, after having viewed a large number of men in police lineups in Atlanta, and in Birmingham.

Mrs. Florence Wickware, wife of a cabinet maker employed by the Jefferson County Board of Education, testified that she and her husband passed the Perry Jewelry Company at about 8:05 p.m. on the night of October 30, 1947. She observed a man inside the Jewelry Company at the window removing jewelry from the window, and it looked like he was "putting it in something" she could not see. Mrs. Wickware identified the man she saw in the jewelry store window at this time as being John B. Baker.

Further testimony tending to connect the petitioner with this offense was given by Mr. R. L. Key and Mr. Lewis Wesley Goins.

Mr. R. L. Key, an employee of the Young and Vann Supply Company in Birmingham testified that he lives about a block from the Perry residence in Birmingham.

On the Monday night preceding the robbery on Thursday, October 30, between 8:30 and 9:00 o'clock, Mr. Key observed a dark colored, four door Chrysler automobile parked about 30 feet west of his driveway. Two people were in the Chrysler at this time but Mr. Key did not get a good look at them. This car was facing west toward Perry's house.

Again, at about 7:00 p.m. on Thursday night, October 30, the night of this robbery, Mr. Key again saw this automobile parked in almost the identical spot. This time it was unoccupied. Mr. Key at this time was backing out of his own driveway, and as he came to the Chrysler he stopped and observed the license number and made a mental note of it. The license number according to Mr. Key was Georgia F—27695. His wife was with him at the time and they had a conversation about the car.

The next day Mr. Key had an interview with the police about this car and at this time gave them its license number.

Tieing in with this phase of the evidence is the testimony of Mr. Lewis Wesley Goins, a garage attendant for the Motor Inn Storage Garage in Vincennes, Indiana. Mr. Goins testified that between 6:00 and 7:00 a.m. on October 31, 1947 (the morning after this robbery) a man whom he identified as being the petitioner brought a Chrysler sedan to the Motor Inn Storage Garage for storage. He also ordered an oil change, and a washing and greasing for the car. The Chrysler bore a Georgia tag No. F—27695, the same license tag number noted by Mr. Key on the car observed by him. The petitioner called for the car a few days later. This witness conversed with the petitioner on both of his visits to the storage garage. The records of the storage garage, required to be kept under Indiana law, and made as to this car by Mr. Goins were introduced in evidence.

The petitioner introduced Mr. J. W. Welch, Jr. and Mr. J. R. Norrell as witnesses in the hearing below.

Mr. Welch, who is with the Standard Duplicating Company in Birmingham testified that on the night that the Perry Jewelry Company was robbed he and his wife paused to look at the jewelry display in the windows of that store at a few minutes after 7:00 o'clock. At the opposite window a man was standing with his shoulder against the glass. While they were looking in the window he heard two crashing noises inside the store. They moved to look at a display in the window near the door, and the man who had been leaning on the window deliberately came in front, knocking Mrs. Welch's pocketbook from her left arm. Mr. Welch "looked at the man and got a very good description, and gave him a dirty look." This man was not the petitioner G. B. Parsons.

Mr. Norrell, a detective for the City of Birmingham testified that he saw the Perry automobile in the "police alley" at around 9:00 o'clock or after on the night it was alleged to have been stolen. This was after he had heard the Perry Jewelry Company had been entered. He was within a block of the jewelry store that night, but did not go to the store. He did not see the petitioner that night prior to the time he observed the Perry automobile in the alley. He saw none of the acts done that night in connection with the Perry car or store.

■ The legal principles concerning the allowance or disallowance of bail to one charged with a criminal offense are clearly set forth by Carr, J., in the case of Turner v. State, 32 Ala.App. 465, 27 So.2d 239, 240, wherein he states:

"At common law all charged crimes were bailable, and this right is given under our Constitution and laws, 'except for capital offenses, when the proof is evident or the presumption great.' Section 16, Dec. of Rights, Constitution 1901; Ex parte McAnally, 53 Ala. 495, 25 Am.Rep. 646. * * *

"'A defendant cannot be admitted to bail when he is charged with an offense which may be punished by death, if the court or magistrate is of the opinion, on the evidence adduced, that he is guilty of the offense in the degree punishable capitally * * *.' Title 15, Section 195, Code 1940. See also, Title 15, Section 196, Code 1940.

"By a long line of authorities it has been held that a safe rule to follow is to deny bail if the court would sustain a capital conviction by a jury based on the same evidence as that taken at the hearing seeking bail; and to allow bail if the evidence is not so efficacious. Ex parte Nettles, 58 Ala. 268; Ex parte Brown, 65 Ala. 446; Ex parte Sloane, 95 Ala. 22, 11 So. 14; Earnest v. State, 21 Ala.App. 534, 109 So. 613."

By statute the penalty in this State for one convicted of robbery is death, or imprisonment in the penitentiary for not less than 10 years. Code 1940, Tit. 14, § 415.

■■ The participation in a crime and the community of purpose of the perpetrators need not be proved by direct or positive testimony, but may be inferred from

314

circumstantial evidence, West v. State, 25 Ala.App. 492, 149 So. 354; Kelly v. State, 31 Ala.App. 194, 13 So.2d 691; Williams v. State, 31 Ala.App. 48, 11 So.2d 870, and where several persons participated in a robbery it is immaterial which one takes the property. Hood v. State, 18 Ala.App. 287, 92 So. 30. All persons participating in a crime are guilty as principals. Title 14, Section 14, Code of Alabama 1940.

■ Whether an automobile is taken with a larcenous intent, or merely to use as a means of escape is a question for the jury. Root v. State, 247 Ala. 514, 25 So.2d 182.

■ Impinging on the above principles is the doctrine that where a cause is heard before a court without a jury his conclusions from the evidence presented must be accorded the effect of a jury verdict. Furthermore, such conclusions will only be hesitantly disturbed by us, and then only after resolving every presumption in favor of correctness of the lower court's action in the premises. See Ala.Dig., Crim.Law, ☜260(11) for numerous cases pertaining to the above principles.

■ We will follow our usual course in causes of this nature and will comment on the evidence only to the extent of saying that after careful consideration of the evidence submitted, and the doctrines pertaining thereto and by which we must be governed, we find no reasons, satisfactory to us, for disturbing the judgment of the lower court denying this petitioner bail and remanding him to custody. The cause is therefore due to be affirmed and it is so ordered.

Affirmed.

BRICKEN, Presiding Judge (dissenting).

The rule governing the point of decision presented in the case at bar, has been long established, and has been correctly stated in the foregoing opinion. However, I am not fully convinced of its applicability to this case, under the facts stated, and without elaboration or further discussion I feel impelled to enter my dissent to the conclusion reached and announced by my associates.