294 So.2d 457

**Lloyd Wayne MURPHY, alias**

v.

**STATE.**

**5 Div. 223.**

Court of Criminal Appeals of Alabama.

March 5, 1974.

Rehearing Denied April 9, 1974.

HARRIS, Judge.

Knox M. McMillan, Auburn, for appellant.

William J. Baxley, Atty. Gen., and William M. Bowen, Jr., Asst. Atty. Gen., for the State.

On the night of February 7, 1972, a robbery occurred just outside a night club on the Auburn-Opelika Highway around 11:40 P.M. The victim was an assistant professor at Auburn University in the School of Engineering. Earlier that night he had served as statistician for the Auburn-Kentucky basketball game. He had agreed to meet some friends at this club after the game. He drove to the club alone around 10:30 P.M. and had drank two mixed drinks with his friends. He parked his vehicle in front of a building a short distance from the club. He had $460.00 in currency in his pocketbook, which he carried in his right hip pocket. He also had two credit cards in his pocketbook—one Master Charge Card and a Standard Oil Card (Chevron National).

The professor left the club about 11:40 P.M. and started walking toward his parked motor vehicle to go home. He was alone. The night was cold and he had on a heavy overcoat. Enroute to his vehicle, he was suddenly and unexpectedly struck on the back of his head. The blow knocked him off balance and he fell flat on his face. While lying on the ground he felt someone on his back and he was struck several more times on the back of his head. When the beating stopped, he struggled to his feet and observed one or more men running back toward the club to a waiting car with the motor running, the lights on and a door on the passenger side opened. He saw them get into the car and before the door could be closed, the car sped away. When the professor got into his vehicle, he realized for the first time that his pocketbook was missing. He returned to the place where he was knocked down and

searched the area but did not find his pocketbook. He immediately called the Auburn Police Department and reported the incident and an investigation got under way.

On March 6, 1972, two police officers from Auburn, Alabama, went to New Orleans, Louisiana, and saw appellant in the Parish jail. The time was 2:00 A.M. A court order was issued directing that appellant be surrendered to the custody of the police officers and they brought him back to Auburn the same day. At the Auburn Police Station he was given the *Miranda* warnings. He signed a waiver of counsel form and made an oral statement to the interrogating officers which was reduced to writing. This statement was read to appellant by the officers and he read it also. Appellant suggested that the word "were" be interlined in one sentence. After the interlineation was made, appellant initialed the change.

The Waiver of Counsel Form is as follows:

"ST–X–5
6–6–72
RS

"WAIVER OF COUNSEL BY DEFENDANT IN CUSTODY

"I Lloyd Wayne Murphy, have been informed by the undersigned law enforcement officers, prior to being questioned by them, that I am suspected of the offense of Robbery in Lee County, Alabama, on the 7 day of February, 1972, and have been informed by them of my Rights as follows:

"1. That I may remain silent and do not have to make any statement at all.

"2. That any statement which I might make may be used against me in Court.

"3. That I have a right to consult with an attorney before making any statement and to have such attorney present with me while I am making a statement.

"4. That if I do not have enough money to employ an attorney, I have the right to have one appointed by the Court to represent me; to consult with him before making any statement; and to have him present with me while I am making a statement.

"5. That if I request an attorney, no questions will be asked me until an attorney is present to represent me.

"After having my Rights explained to me, I freely and voluntarily waive my right to an attorney. I am willing to make a statement to the officers. I can read and write the English language and fully understand my Rights to an attorney. I have read this Waiver of Counsel and fully understand it. No threats or promises have been made to me to induce me to sign this Waiver of Counsel and to make a statement to the officers. This 6 day of March, 1972.

"X (signed) Lloyd W. Murphy

"All of the Rights in the above Waiver of Counsel were read and explained to the above defendant by me and he freely and voluntarily waived his right to an attorney. No threats, promises, tricks, or persuasion were employed by me or anyone in my presence to induce him to waive his rights to an attorney and to make a statement without an attorney. He freely and voluntarily signed the above Waiver of Counsel in my presence after having read it.

"(signed)  Ted Murphy
            Det. Sgt.
            (Title)

"Witness by:
"(Signed)  Frank M. deGraffenried
Det. Lt. Auburn Police Dept
8:12 P.M., March 6, 1972"

The signed statement of appellant is as follows:

"ST X–6
6–6–72
RS

"AUBURN POLICE DEPARTMENT
Auburn, Alabama

"Statement of Lloyd Wayne Murphy
Name Lloyd Wayne Murphy Date March 6, 1972
Place Auburn Police Dept., Auburn, Ala.

"My name is Lloyd Wayne Murphy Age 19 DOB June 8, 52
Address 249 Tichenor Ave., Auburn, Ala.

"I am making a voluntary statement to Det. Sgt. Ted Murphy. This Statement is made of my free will, without any threats, promises, or duress, having been made toward me.

"I have been advised by Det. Sgt. Ted Murphy that I don't have to make a statement and that I may have legal counsel. I have signed a waiver of counsel.

"On Monday night the 7th of February 1972, I Lloyd Wayne Murphy was at Fuccis' on Opelika Road in Auburn, Ala. I was with Eric Romberg, Rusty Bryant, and Bill Berry. We (were) (RM) sitting around drinking beer. I had gotton (sic) pretty drunk. We started to talking about needing some money and decided to roll some dude in the club when he left. We didn't have anyone in mind. Just the first dude to leave the club. At first I was scared about going to jail if we got caught, but the drunker I got the less I cared about jail. Then this dude I now know to be John W. Wingard left the club by himself. He was pretty drunk; and we followed him outside. I guess I was more determined than the rest, so I run up behind him and just kind of pushed him real hard with the heel of my hand. He fell to the ground, and I put my foot on the back of his neck, without any force, and held him on the ground. The dude just yelled "What, What, What." Eric run up and got the dudes (sic) billfold out of his pocket. I didn't want to do him any harm. I just wanted to get his money. Then me, and Eric and Rusty run and got into Bills' (sic) car. Bill had already got in the car and cranked it up. We then left the scene and drove to Columbus, Ga. and got something to eat. On the way to Columbus we split the money up. I got $160.00 and two credit cards, one Master Charge and one Standard Oil Card. After leaving Columbus we all come back to Opelika and Eric and I stayed in Rusty Bryants' (sic) apartment in Opelika that night. Then the next day, Eric and I left and hitch hiked to New Orleans, La. When we got to New Orleans we went to the Rost Internation (sic) and I used the Master Charge card I had gotton (sic) from Winegard to get us something to eat. Then we went to the Ramada Inn and I used the Standard card to get us a room and some more meals. On the 9th of February, Eric got arrested and the Police were chaseing (sic) me. I pulled the credit cards from my pocket and broke them up and threw them away. Later on that eveing (sic), late in the night I got arrested and stayed in the jail in New Orleans untill (sic) Sgt. Ted Murphy and Lt. deGraffenried come and got me this date. This statement is true and correct to the best of my knowledge.

"(Signed)     (Signed) Lloyd W. Murphy
Ted Murphy
Det. Sgt.
8:57 PM
3–6–72

"(Signed)
Lt. Frank deGraffenried
Mar. 6, 1972"

Appellant and Eric Romberg, one of the trio who removed the professor's pocketbook while appellant held the

helpless victim on the ground, hitchhiked to New Orleans, Louisiana, the next day after the robbery. The appellant used the Master Charge credit card at a local restaurant to pay for a meal for both of them. They then registered at the Ramada Inn and appellant used the Chevron National Credit Card (Standard Oil Company) to pay for the room and all their other purchases and meals. Appellant signed his name as "Lloyd W. Murphy" on each card that they found in the professor's pocketbook after the robbery to pay for these purchases and services received by them. On March 30, 1972, the Standard Oil Company mailed these charges totaling $48.44 to the professor for payment. The postmark on the envelope shows that they were mailed to him from Louisville, Kentucky. The professor paid these charges but kept the cards showing these purchases and turned them over to the prosecution along with the envelope in which he received them through the United States Postal Service. These documents, properly identified by the robbery victim, were introduced in evidence over appellant's objections that they tended to show the commission of another offense not charged in the indictment.

The only error urged upon us for a reversal is the admission into evidence of these credit card receipts signed by appellant and the envelope in which they were received by the victim of the robbery.

■ The general rule is that evidence of distinct and independent offenses, sometimes referred to as collateral crimes, are not admissible in the trial of a person accused of a particular crime. However, there are well-recognized exceptions to this rule and one of paramount importance is the "identity exception".

■ These recognized exceptions to the general rule have developed into general categories and are listed in Wharton's Criminal Evidence, Section 31, as follows:

"These exceptions fall under the following general divisions: (1) Relevancy as part of res gestae. (2) Relevancy to prove identity of person or of crime. (3) Relevancy to prove scienter, or guilty knowledge. (4) Relevancy to prove intent. (5) Relevancy to show motive. (6) Relevancy to prove system. (7) Relevancy to prove malice. (8) Relevancy to rebut special defenses. (9) Relevancy in various particular crimes. It is recognized that in many instances the line of demarcation is not clear, but the discretion vested in the trial judge, intelligently and considerately exercised, will enable the prosecution fully to present the charge, on the one hand, and, on the other hand, to protect the accused and secure to him the rights guaranteed to him by the Constitution and the laws."

From Wilkins v. State, 29 Ala.App. 349, 197 So. 75, we take the following as expositive of the very issue, and only issue, presented on this appeal:

" * * * It is a well-established common-law rule that in a criminal prosecution proof which shows or tends to show that the accused is guilty of the commission of other crimes or offenses at other times, even though of the same nature as the one charged in the indictment, is incompetent and inadmissible for the purpose of showing the commission of the particular crime charged unless the other offenses are connected with the offense for which he is on trial. In other words, proof of such collateral offenses cannot be used as substantive evidence to establish the guilt of the accused as to the crime charged. 20 Am.Jur., Section 309, pp. 287, 288. Wharton's Criminal Evidence, 10th Ed., Volume 1, Section 30, p. 59. This well-established principle of criminal evidence, however, is subject to several, equally well-established exceptions, which include cases where intent or identity is involved. As found in 22 R.C.L., Section 39, p. 1204: 'But this general rule is not to be followed blindly and evidence rejected on the sole ground that it does show the commission of another crime. If evidence is relevant and

competent it should be admitted regardless of its incidental effect. Accordingly it is held that evidence of another crime is admissible where it tends to identify the accused.'

"And we also add that such evidence should also be admitted where it tends to show the intent with which the act was done. Or as stated in Underhill's Criminal Evidence, 4th Ed., Section 181, p. 318: 'To this general rule there are several distinct exceptions which have been permitted *from absolute necessity, to aid in the detection and punishment of crime.* These exceptions ought to be carefully limited and guarded by the courts and their number should not be increased. But it must be admitted that the *modern* tendency on the part of the courts is to *be liberal* in the admission of evidence of collateral crimes. The exceptions to the general rule arise either from the necessity of the case or the nature of the offense, as for example, * * when the *intent* or motive is to be proved from the circumstances, or where the *identity* of the accused is expressly in issue.' " (emphasis added)

These exceptions to the general rule have become so embedded in the judicial fabric of the jurisprudence of this State that further citation of authorities would seem to be unnecessary. But for a collection of these authorities, see Weatherspoon v. State, 36 Ala.App. 392, 56 So.2d 793.

Where several persons participate in a robbery, it is immaterial which one takes the property. Gibson v. State, 49 Ala.App. 18, 268 So.2d 49; Parsons v. State, 33 Ala.App. 309, 33 So.2d 164.

The fact that the victim did not see the men who robbed him and, therefore, could not make a positive identification is not fatal. The undisputed fact that the appellant took possession of the credit cards that were found in the victim's pocketbook and signed his own name to the credit card receipts for meals and motel room services,

without *any explanation* as to how he came into possession of the credit cards coupled with his voluntary confession that he was a participant in the crime of robbery, was sufficient to sustain the verdict and judgment of conviction. Arnold v. State, 47 Ala.App. 500, 257 So.2d 118.

The judgment appealed from is due to be affirmed.

Affirmed.

All the Judges concur.