326 So.2d 707

**Norman Leroy McDANELD**

v.

**STATE.**

**I Div. 670.**

Court of Criminal Appeals of Alabama.

Feb. 3, 1976.

---

Arthur P. Clarke, Mobile, for appellant.

William J. Baxley, Atty. Gen., and Milton C. Davis, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Appellant was convicted of robbery and his punishment fixed at thirty years in the penitentiary. With court-appointed counsel present at arraignment he pleaded not guilty. After sentence was imposed he gave notice of appeal. He was furnished a free transcript and trial counsel was appointed to represent him on appeal.

The evidence for the State is undisputed that in the early morning hours of February 23, 1975, the Magic Mart Grocery Store located at 2320 Government Street in Mobile, Alabama, was robbed by a lone gunman armed with a pistol.

Mary Massingill testified that she was employed by the Magic Mart and that her hours of employment were from 11:00 p.m. until 7:00 a.m. She stated that around 3:45 a white man whom she identified as appellant came in the store and paid for $2.00 worth of gas and a coke and walked over to the book rack and started looking at the books. She said her attention was attracted to this man as he was not looking at the books as a person ordinarily looks at books but kept looking at her. She was trying to run the cash register and trying to keep an eye on the man because of the way he was looking at her. In a few minutes this man walked out of the store. She made a positive in-court identification of appellant as the man who purchased the gasoline and coke and who was looking at the books.

She further testified that between ten and fifteen minutes later another white man came in the store and stuck the pistol on Bruce Fowler who was employed as a night watchman for the U. S. Corps of Engineers which building was located next door. Fowler was in the Magic Mart to get a cup of coffee. The gunman told Fowler he wanted his weapon. After relieving Mr. Fowler of his weapon, he ordered him to go to the back of the store and then pointed the pistol at Mrs. Massingill and demanded all the money. The man had a cloth sack and she gave him all the money from the cash register in the amount of $470.50 consisting of currency and change.

Mrs. Massingill stated that the place was well lighted both inside and outside the store and she got a good look at both men. She attended a preliminary hearing and identified both men. She said she could not identify the woman who was arrested with the two men as she did not come in the store. She stated as soon as the man walked out with the money, she picked up the telephone and called the Mobile Police Department and reported the robbery.

Mr. Bruce Fowler testified he was employed by the General Services Administration to keep the U. S. Corps of Engineers building under surveillance and that at 3:54 a.m. on February 23, 1975, he went

in the Magic Mart to get a cup of coffee. That one minute later a man came in and held up the store. He said the man told the clerk and him that this was a holdup and told Fowler to drop his gun belt. Fowler raised his hands and told the man if he wanted his gun belt, he would have to take it. That the man moved around behind his back and put the pistol to the rear side of his head and unstrapped the safety strap and took Fowler's revolver and told him to move to the rear of the store. Fowler moved to the rear and positioned himself so he could see what was going on from the rear. He heard a conversation but could not understand what was being said. He heard metal clanging against something and saw a bag. He said he had seen the robber at approximately 3:45 a.m. getting gas in a white square styled Mercury with a luggage rack on top and that the robbery occurred at 3:55 a.m. He stated the robbery took about four minutes and that as soon as the man walked out the clerk called the City police and that he took the telephone from her and put out an all points bulletin and gave a description of the man and the car he was in. He was asked to describe the man and replied:

"The man is approximately five foot, nine, a hundred and forty - hundred and fifty pounds, white male, sandy red hair, fair complexion, and had on a gold tan field jacket and bluejeans."

Fowler was shown State's Exhibit 1B and was asked if he had ever seen this revolver before and replied that it looked very similar to the one used in the holdup.

Michael Long testified that he was with four other friends on the morning of February 23, 1975. They left Sambo's Restaurant and were walking up the street toward the Magic Mart.

From the record:

"Q. Now, tell the ladies and gentlemen of the jury what occurred as you went up towards Magic Mart?

"A. Walking up the street approximately a block from the store, we saw a car that was slowly beginning to back up. As we walked by as we came closer to the store, we saw two men come running from around the corner of the store. When they got closer, one girl that was with us said, 'what it is,' greeting one of the dudes, and the guy raised up his hand like this (indicating) and had a gun in his hand and asked, 'what's happening?' and kept going.

"Q. Now, describe - well, do you see anybody in the courtroom today that you saw that night?

"A. Yes, sir.

"Q. Point him out for the ladies and gentlemen of the jury?

"A. That man right there. (indicating)

"Q. Let the record reflect that Mr. Lenz identified the defendant in this case, Norman McDaneld.

"Q. Now, what if anything did the defendant have in his hand?

"A. It was a gun.

"Q. Now, what kind of a gun?

"A. It was a pistol. It looked to be like a small revolver."

Lenz further testified that the two men walked within three feet of him and got in a white, four-door, car with a luggage rack on top and the car had tags from the State of Washington on it. Lenz stated there was no doubt whatsoever in his mind that appellant was one of the men he saw that morning running from the Magic Mart with a pistol in his hands and get in the car above described. He said as the men passed within three feet of him, he noticed one of them was wearing a "goldish colored jacket," and was carrying a bag.

Mr. David Havard testified that he had been employed by the Mobile Police Department for five years and was assigned

to the patrol division on the midnight shift. He stated he was familiar with the Magic Mart on Government Street and that the area was well lighted at night. He stated he was having breakfast around 3:50 a.m. on February 23, 1975, at a restaurant on Highway 90 when he heard a holdup alarm come over the police radio. He explained that when a place is robbed and the victim calls the Police Department the actual conversation between the victim or the person calling and the dispatcher is passed over his radio, and they receive a description and the information at the same time the operator does.

From the record:

"Q. Based on that call, did you take any action?

"A. Yes, sir. The first information they give out on the holdup alarm is the location of the robbery. I rushed out and got in my patrol unit and pulled out of the parking lot there to the edge of the parking lot on Highway 90 where I could observe Highway 90.

"Q. What if anything happened then?

"A. A white old model Mercury, kind of dirty, came by headed west on Highway 90 with a luggage rack on top which fitted the description of the vehicle used in the robbery of the Magic Mart store, basically the same description I had received over the radio was the old model white Mercury with a luggage rack on top of it.

"Q. What if anything did you do then?

"A. I fell in behind the vehicle and advised the operator I had the vehicle in sight and I was following it west on Highway 90. I stopped it at Highway 90 and Pleasant Valley Road.

"Q. About what time was it in the morning?

"A. It was between three forty five and four o'clock. I am not certain of the exact time.

"Q. All right, tell the ladies and gentlemen of the jury what happened then?

"A. I proceeded to follow the vehicle west on Highway 90. I turned the blue lights on just as it was approaching Pleasant Valley Road. The car pulled over to the right hand side of the road. I got out with my shotgun and a white female got out of the driver's side of the vehicle. At this same moment, the back-up vehicle arrived. I ordered all subjects to stay where they were until the backup unit got to the vehicle. We then took the driver, the white female, Brenda Jean Johnson, and placed her in the rear of my scout car. We went around to the passenger side of the vehicle when we took out the white male, Robert McDaneld, sitting next to the door. Another white male, Norman McDaneld, was sitting in the center of the seat.

"Q. Do you see anyone here in the courtroom that was in that car when you stopped it?

"A. Yes, sir.

"Q. Point him out for the ladies and gentlemen of the jury?

"A. The defendant, Norman McDaneld, sitting next to Mr. Clark.

"Q. Let the record reflect Officer Havard indicated the defendant.

Continue, what if anything happened then?

"A. We took the subjects out of the vehicle. They were placed under arrest and advised of their rights and placed in separate patrol units to keep all of the suspects separated.

"We started the initial search of the vehicle. We removed four revolvers from the front seat, two loaded rifles from the back seat, money bag from the back seat, box of shells.

"Q. Did you find any money in the car?

"A. Yes, sir; we found a money bag, a white cloth type money bag in the back seat, that had been dropped over the back seat.

"Q. Now, how much money was found in that?

"A. It was in the neighborhood of four hundred and some odd dollars in the car. Off of the first subject we took out of the car we found a little over two hundred dollars.

"Q. Who was that if you know?

"A. That was Robert McDaneld.

"Q. Let me show you what has been marked for identification purposes as State's Exhibit 1B–2B and ask if you have ever seen these before?

"A. Yes, sir.

"Q. Tell the ladies and gentlemen of the jury where you first saw them?

"A. Both of them weapons was loaded and laying under the front seat of the vehicle the suspects were in.

"BY MR. VALESKA: Your honor, we would like to offer this in evidence at this time as State's Exhibit 1B and 2B.

"BY THE COURT: Order them admitted."

This witness also identified State's Exhibits 3B and 4B as a twenty-two western style loaded revolver under the front seat of the car and a thirty-eight automatic near the luggage on top of the car and it was unloaded. All of the weapons found in search of the car where the suspects were apprehended were admitted in evidence without objections.

This witness further testified that two rifles were found in the back seat of the car. There was a three o eight Winchester which was loaded and a 30–30 Winchester lever action rifle which was unloaded. He stated that all three suspects were arrested and searched and given the *Miranda* rights at the scene of the arrest. All three suspects were put in separate patrol cars and carried to the station house where they were again read their rights and asked if they wanted to make a statement. One of the suspects signed a waiver and the two other suspects refused to sign a waiver or make a statement, and said they wanted a lawyer.

When appellant was searched the officers found only pocket change on him. Appellant's brother had $200.00 in his pocket and the rest of the money was found in the bag on the back seat of the car. They were arrested about four minutes after the robbery.

Appellant's brother, Robert McDaneld, was first tried and convicted for the robbery of the Magic Mart the day before appellant was put to trial. Appellant did not testify. Robert McDaneld testified and tried to take the entire blame for the robbery.

In sum, he testified that he lived in the State of Washington for over twenty-six years and that because of the snow and cold weather, he and his brother decided to go to Pensacola, Florida, to look for work. They arrived in New Orleans some time in early February and stayed there about one week. They spent most of their time in a local bar drinking. In this bar they met a woman, named Brenda Johnson, whose husband was a seaman stationed in Texas. They became very friendly with Brenda and they persuaded her to go with them. According to his testimony, they were going to spend the night in Biloxi, Mississippi, but went on to Mobile. They got off the freeway in Mobile to get gas and then started back to the freeway to Biloxi. That he discovered he was out of cigarettes and went back to the Magic Mart where they had just purchased gasoline. That he went into the Magic Mart to get some cigarettes and since they were running low on money he decided to rob the

place. Later he stated that it was not that they were low on money that he decided to rob the store but he just robbed the Magic Mart on the spur of the moment.

He further testified that he and his brother had not planned to rob the place and that his brother did not know he was going to rob the place and was not present and took no part in the robbery. He stated that he did not give his brother any of the money that he took in the robbery. He admitted that when the officers stopped them, Brenda was driving the car and his brother (appellant) was seated in the front seat between him and Brenda. He said all of the weapons, loaded and unloaded, belonged to him. That he bought and paid for both rifles and all the pistols. He further admitted that when the officers stopped them, he had $200.00 in his coat pocket and the rest of the money was in a bag on the back seat. He stated that appellant and Brenda stayed in the car when he went in and robbed the store.

On cross-examination he testified that his brother passed out in Biloxi but on further cross-examination when he was asked if his brother went in the store he replied: "I don't have the slightest idea whether he did or not."

On further cross-examination he admitted he gave the officers a signed statement concerning the robbery and in that statement he did not say that his brother passed out in Biloxi.

To the very end he maintained that neither Brenda nor his brother took any part in the robbery but that he was the sole actor in the robbery and could give no reason why he committed the robbery.

We are not confronted with the sufficiency of the evidence in this case. There was no motion to exclude the State's evidence; there was no request for the affirmative charge. There was a motion for a new trial, but this motion made no claim that the State failed to make out a prima facie case. *Eady v. State*, 48 Ala.App. 726,

267 So.2d 516; *Price v. State*, 53 Ala.App. 465, 301 So.2d 230; *Mosley v. State*, 54 Ala.App. 59, 304 So.2d 613; *Broadnax v. State*, 54 Ala.App. 37, 304 So.2d 278.

■ Where the testimony of eyewitnesses placed the defendant at the scene of the crime and as an active participant in the robbery in which more than one person participated, it was immaterial which one took the money as they were all guilty as principals. *Johnson v. State*, 52 Ala.App. 277, 291 So.2d 369; *Murphy v. State*, 52 Ala.App. 490, 294 So.2d 457.

■ If there is a reasonable inference to prove the existence of the corpus delicti, the Court should submit to the jury for consideration the question of the sufficiency and weight of the evidence tending to support that inference. *Hines v. State*, 260 Ala. 668, 72 So.2d 296.

■ Where there is legal evidence from which the jury can by fair inference find the defendant guilty, this Court has no right to disturb the verdict. Whether there is such evidence is a question of law, its weight and probative value are for the jury. *Haggler v. State*, 49 Ala.App. 259, 270 So.2d 690.

■ The only claim of error is the refusal of the trial court to give the jury two written requested charges on lesser included offenses, viz., larceny and assault and battery. We hold there was no error in the refusal of these charges. The evidence for the State, as well as the testimony of appellant's brother, show clearly the crime of robbery was committed and the trial court was not required to charge on the lesser included offenses. *Taylor v. State*, 48 Ala.App. 443, 265 So.2d 886; *Brooks v. State*, 36 Ala.App. 310, 55 So.2d 366; *Kelly v. State*, 235 Ala. 5, 176 So. 807.

The judgment of the Circuit Court is ordered affirmed.

Affirmed.

All the Judges concur.