HARRIS, Judge.
Appellant was convicted of forgery and the trial court sentenced him to two years imprisonment in the penitentiary. With counsel present at arraignment appellant pleaded not guilty and not guilty by reason of insanity. After conviction he gave notice of appeal and requested a free transcript. He was determined to be indigent and the Court granted his request for a fre„e transcript. Trial counsel was appointed to represent him on appeal.
The evidence adduced by the State is not disputed. Appellant did not testify nor did he offer any evidence in his behalf.
At the commencement of the trial the prosecution introduced State’s Exhibit No. 1 without objection. This exhibit was a U. S.Treasury Check No. 23804057, dated August 1, 1974, in the amount of $314.95, and was issued to Ben Peck, 955 Highland Avenue, Montgomery, Alabama, 36104.
Gail Robinson then testified that on August 1, 1974, she was working for the First National Bank, Adams Avenue Branch, as a utility teller. She described a utility teller as a person who is transferred among the various branches of the bank and fills in for people who are not at work due to being on *84 vacation. The utility person takes the P.T. number of the absent person.
Mrs. Robinson testified that on August 1, 1974, someone relayed a note to her as Ronnie Dotson and she cashed a check for him. She stated that State’s Exhibit No. 2, check number 23804057, a government check, was the check she cashed for appellant. Further identification of this check was made by the P.T. # 49, which was her P.T. stamp.
While Mrs. Robinson was at the Western Branch some time after she took the above check she was shown six pictures by a Charles Martin and out of those pictures she picked the appellant and another one. She stated that she picked the two because they looked similar. Despite the fact that she picked out two pictures she couldn’t say positively if these two were the ones or one who cashed the check.
Her original description was that it was a young black male. She also stated that they had quite a few colored people out at the Adams Avenue Branch.
Further testimony by Mrs. Robinson was that she worked ten hours that day and they were hectic hours. She also cashed other checks from young black males that day and she estimated the number of checks as more than five.
Mrs. Robinson said the person stayed at the cashier’s window long enough for her to give him a pencil to endorse the check. She has no idea how long this took but she remembered stamping the check after getting it and her recognition of the check is by her stamp number.
The type clothing worn by this person was not noted by Mrs. Robinson. She did not recall ever seeing this person again.
Mrs. Robinson said the man came by with the pictures in August but she didn’t remember as it was a few months later. She also stated that she couldn’t swear if the photographs were of all young black males and she couldn’t say if appellant was the person she saw that day.
Carl Martin testified that he was employed in Montgomery, Alabama, for the United States Postal Service and that he had been employed in that capacity for eight and a half years.
Mr. Martin further testified that he was involved in the investigation of an alleged forgery of a check issued to Ben Peck. During this investigation he talked to Gail Robinson at the First Alabama Bank. He showed Mrs. Robinson a photocopy of a check payable to Ben Peck and six photographs of black males.
Mrs. Robinson was able to identify the check according to Carl Martin. He also said that he talked to appellant two times; Montgomery City Jail, October 10, 1974, and November 11, 1974.
During the first time that he talked to appellant he obtained a copy of appellant’s fingerprints. Over appellant’s objection State’s Exhibit No. 3, a copy of appellant’s fingerprints, was admitted into evidence.
Mr. Martin further stated that he never had State’s Exhibit No. 2 in his possession. This exhibit was the check in question. He stated that during the questioning of appellant concerning this check he was cooperative to a certain point and became uncooperative when asked for some handwriting samples.
According to Mr. Martin, appellant refused to discuss the case during the time and he would not sign the waiver form.
State's Exhibits 4, 5 and 6 were copies of appellant’s handwriting samples which Carl Martin testified that he obtained from appellant. These exhibits were introduced into evidence over appellant’s objection.
Mr. Martin testified that State’s Exhibit No. 3 (fingerprint copy), left his hands on October 16, 1974, and this was sent to Cincinnati Postal Crime Lab, Cincinnati, Ohio, by registered mail No. 23214.
State’s Exhibits No. 4, 5, and 6 (handwriting samples) were mailed by Martin on October 2, 1974, to the same address by registered mail No. 23858.
*85 Martin admitted that Mrs. Robinson stated she couldn’t identify the person she saw.
James Dibowski testified that he lived in Cincinnati, Ohio; that he was an examiner of questioned documents or handwriting expert; that he was Laboratory Director of the Cincinnati Crime Laboratory which is one of four postal inspection service laboratories in the country. The Cincinnati lab serves the Eastern part of the United States.
His duties consisted of making examinations and comparisons of disputed documents submitted to him. He further stated that he had received substantial training in handwriting and fingerprint examination.
According to Dibowski he began his studies in 1947 and has continued them up to the present time. He estimated that he had examined close to the neighborhood of half-a-million disputed documents.
He further stated he had qualified and testified many times in State and Federal Courts in 21 states. His laboratory in Cincinnati is completely equipped and he has performed work for other governmental agencies including the Secret Service, Bureau of Narcotics and the Customs Office.
Dibowski then described the various methods of lifting fingerprints that he had studied including the dusting method; the silver nitrate method and the iodine method. According to Dibowski the Nind Hyd-rin method was studied in recent years and this method was developed in the Cincinnati laboratory and other postal laboratories. He stated that in the last 12 years all the stolen checks and money orders that are submitted to him are processed with the Nind Hydrin process.
The Court then allowed Mr. Dibowski to testify as an expert witness. The defense did not question the qualifications of this witness.
He identified State’s Exhibit No. 2 as a U. S. Treasury check number 23804057, payable to Ben Peck in the amount of $314.95 which he ordered from the Department of Treasury back in September, 1974, and which was received in the laboratory on February 10, 1975. He kept this check in his possession from that time until the date of the trial.
Dibowski identified State’s Exhibit No. 3 as a fingerprint document of a Ronnie Dotson, submitted to him by Postal Inspector Carl Martin in October of 1974. He then stated that he processed State’s Exhibit No. 2 for fingerprints and that he found two suitable for comparison. These prints were located on the front of the check.
Mr. Dibowski testified that he used the Nind Hydrin process to check State’s Exhibit No. 2 for prints and that upon finding the prints usable he compared these prints to the prints located by State’s Exhibit No. 3. From this comparison he reached the conclusion that one of the developed latent fingerprints on the face of State’s Exhibit No. 2 is an impression of the right middle finger of Ronnie Dotson as it appears on State’s Exhibit No. 3.
He then produced a chart which he used to show the eight points of identification which the postal service feels are necessary for making a positive identification.
On the chart under the word questioned is an enlargement of the developed latent fingerprint on the face of State’s Exhibit No. 2, and on the other side is an enlargement of the middle fingerprint of Ronnie Dotson as it appears on State’s Exhibit No. 3.
He identified the points he marked off as being the skin on the fingers. This skin is described as friction skin which has a series of ridges in it. These ridges form various patterns or various lines. For instance, if the lines come along and end this is called a ridge ending. If the ridge line comes along and forms into two lines, this is referred to as a bifurcation or fork. He stated there is an adequate number of agreeable characteristics between the questioned document and the known print with known differences and concluded that both are the same or were made by the same finger.
On the chart Dibowski marked off 13 identifying points. He described point # 1 *86 as a ridge ending. He stated there were no intervening ridges from point # 1 to point # 2. Point # 3 is a ridge ending; point # 4 is one intervening ridge from point # 3 and it leads down to a fork or bifurcation; point # 6 is two intervening lines from point # 5; point # 10 is 13 intervening lines from point # 6. Dibowski stated that he had 13 points that are in agreement.
Dibowski then stated that he also made a comparison between the known handwriting of the defendant, which was found in State’s Exhibits No. 4, 5, and 6, with the handwriting in back of the check.
He stated that his opinion as a result of that comparison was that the person who wrote the endorsement “Ben Peck” which appears on State’s Exhibit No. 2 was written by the same person who completed the handwriting samples described as State’s Exhibits 4, 5, and 6, which are purported to be the handwriting and handprinting of Ronnie Dotson.
Dibowski stated that he had four samples of the capítol “B” as written by Ronnie Dotson. He had three samples of the capí-tol letter “P”.
He stated that handwriting comparison is based on the combination of usual features in one writing and finding the same group of characteristics in another writing. In the “B”' he described it as being started with a little bit of a hook in an upward position and described this as a printed style of “B”. He found the same characteristic in the first sample. Another feature is the little bit of upper hook in the staff of the “B”. He found the same feature in lines 2 and 3 of the known. He also found that the proportions of the upper portion of “B” to the lower proportions, between the questioned and known are in very good agreement, particularly with sample of line 3.
The “E” started with a little bit of a down stroke and he stated this is a characteristic of the writing of the appellant. He compared the second arch of the “N” as being the same characteristic as shown on line 3.
He described the capítol “P” in Peck as being a printed style with the upper portion of the top of the “P” not touching the staff. He stated this as being characteristic in the writing provided by the defendant.
Again returning to the “e” as shown in Peck he described the little bit of a down stroke which he stated as being characteristic of appellant’s writing.
He described “C” as being the most unusual letter due to its eight formation. He found similar comparison characteristics in the sample “Peck” as in the “C” in the State’s Exhibit No. 2.
The letter “K” was described as being a real small “K” which had retracing in it. He described this as being characteristic in the handwriting of appellant.
Thereupon the State’s Exhibits 7, 8, and 9 were offered into evidence over appellant’s objections.
Dibowski stated that he was a criminologist with the Postal Service and that his basic job was the gathering of evidence while working with the postal inspector. He had spent 99% of his time testifying for the prosecution and that he was basically a law enforcement agent, but he said, “If there is any question, I always resolve it in favor of the person who is under suspicion.”
He further stated that in all of his years as an examiner he had never made a mistake and that the job always called for the use of his personal judgment.
Ben Peck testified that he lived at 955 High Avenue and that his address was not Highland Avenue. He identified State’s Exhibit No. 2 as being a check for Ben Peck, 955 Highland Avenue. He stated that the check was for railroad retirement.
He stated that he missed one of his checks back in the first of August. Upon looking on the back of the check he stated that he saw Ben Peck endorsed on it but that he didn’t do it because he couldn’t write, he printed.
Upon looking at appellant, Peck said he did not know appellant and did not authorize appellant to sign his name on the check. *87 Peck said that when he went home, his check was gone and that he did not tell anyone to endorse his name.
Peck stated that he did not see anyone take his check but Mr. Little sent him word that someone said he was Ben Peck’s son and wanted to cash a check. He also said that when he went to Mr. Little’s store, he was told that the young man who tried to cash the check had a full beard.
Jacqueline Arrington testified that she lived at 519 Smythe Curve and that she had known the appellant for five years. She stated that appellant lived across the street from her.
Miss Arrington stated that on August 1, 1974, she was in Mr. Little’s grocery store on the corner of Highland Avenue and High Street and during one of the times she was there she saw appellant there. According to Miss Arrington, he had a check and wanted to cash it for his daddy. She further stated that she thought he said Peck.
She said appellant asked Mr. Little to cash the check which was one of his father’s, but Mr. Little looked on the back of the check and said he couldn’t cash it because it wasn’t signed and for appellant to go home and get it signed. She further stated that after appellant came into the store the second time, Mr. Little refused to cash the check.
Miss Arrington stated that she couldn’t positively state that State’s Exhibit No. 2 was the same check. She also knew that appellant had a family but she didn’t know anything about the family. She also said she didn’t particularly remember anything that happened.
Carl Martin returned to the stand and testified that in the course of his investigation on the subject case he had occasion to talk to Miss Jacqueline Arrington.
He stated that he took a statement from her concerning the attempted forgery of Ben Peck’s check in the Little Grocery Store. He stated that she selected a photograph that resembled the appellant as the person who came into Little’s store and attempted to cash a government check.
Mr. Martin testified that he saw Miss Arrington on September 9, 1974. He took six photographs of young black males with him. He stated the approximate height of these young black males were from 5 feet 11 inches to 6 feet tall but he didn’t know the weight although in the photograph they appear to be slim and had small afros. Mr. Martin further testified that the photographs were of the shoulders and face and all had medium shoulders.
Appellant then moved to exclude all testimony relative to these photographs and the trial court overruled same.
The State rested and appellant then made a motion for the trial court to exclude the State’s evidence based on a failure to prove a prima facie case. This motion was overruled and the defense rested.
Appellant asserts that reversible error was committed because there was a variance between the allegations in the indictment and the proof at trial. The basis for this contention is that the U. S. Treasury check payable to the order of Ben Peck listed his address at 955 Highland Avenue and Ben Peck testified that his address was 955 High Street. Anyone familiar with the streets of Montgomery knows that High Street begins at the intersection of South Court Street and runs east for about 1400 blocks and without a change in direction becomes Highland Avenue; so that in reality High Street and Highland Avenue are one and the same street.
The name of the street is not the material allegation in the indictment against appellant. He was charged with forgery in that he signed the name of “Ben Peck” to Peck’s railroad retirement check. That very check with the endorsement thereon was the subject matter of his trial and the basis of his conviction. There is no material variance where there is proof of so much of an indictment as shows the defendant committed a substantial offense specified therein. Owens v. State, 291 Ala. 107, 278 So.2d 693; Taylor v. State, 47 Ala.App. 285, 253 So.2d 354; Fuller v. State, 39 Ala.App. 219, 96 So.2d 829.
*88 Appellant next contends that the testimony of Jacqueline Arrington prejudiced his right to a fair trial. We do not agree for several reasons. In the first place there was no objection to the testimony of this witness. A review on appeal is limited to those matters on which rulings are invoked in the trial court. Daniels v. State, 53 Ala.App. 666, 303 So.2d 166; Lucky v. State, 50 Ala.App. 324, 278 So.2d 772.
There is nothing in the record which indicates that the testimony of Miss Arring-ton was not a part of the same criminal activity for which appellant stands convicted. Had Mr. Little required appellant to endorse the name of “Ben Peck” to the check and cashed it, the crime of forgery would have then and there been committed.
The testimony of Miss Arrington was clearly admissible to prove identity, scien-ter, intent, motive and scheme. Murphy v. State, 52 Ala.App. 490, 294 So.2d 457.
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur, except CATES, P. J., not sitting.