[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 665 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 666 
Second degree murder; sentence: thirty-one years.
The homicide in question took place at Atmore State Prison on January 18, 1974. It occurred during a prison riot, which inmates termed a "revolution." The victim, *Page 667 
Officer Luell Barrow, was held as a hostage by rioting prisoners in the prison's segregation unit. Appellant was tried for murder in the first degree on February 10, 1975, and on February 12, the jury returned the above verdict and punishment.
Other inmates have also been tried as a result of the riot, assaults and the killing. Johnny Harris, a key participant, was convicted of first degree murder pursuant to Title 14,§ 319, Code of Alabama 1940, and sentenced to death. His conviction was affirmed by this Court on January 20, 1976, and is now pending in the Alabama Supreme Court on automatic appeal.Harris v. State, Ala. App.
The first witness for the State, Nelson E. Grubbs, a State Toxicologist, testified as to his post mortem examination on the body of Luell Barrow on January 19, 1974, at a funeral home in Escambia County. He stated that Barrow had five stab wounds on the head and a total of twenty-seven stab wounds. Dr. Grubbs testified that death was caused by stab wounds, inflicted by a long sharp instrument, possibly a knife some twelve to fourteen inches long. Dr. Grubbs stated, "In my opinion, death would have resulted immediately because the heart was cut almost into two pieces."
The next witness called was Marion Harding, warden at the then Atmore State Prison (since renamed). He stated that he was notified by radio around 3:30 on the afternoon of January 18, 1974, that the inmates in segregation had taken two correctional officers hostage. When he got to the window inside the unit, he was informed that inmate George Dobbins was requesting to talk to him. Warden Harding testified that the following took place:
 "A. When the cardboard was removed and I saw, I asked George Dobbins who was standing at the window along with Oscar Johnson, I asked . . . Dobbins what his problem was. He stated to me he didn't have a problem, that I had a problem. That they were not bitching about the food nor the conditions of the prison, that this is a revolution and the revolution is on.
 "Q. When you saw these inmates would you tell the jury whether or not they were armed at the time you saw them.
 "A. They were armed. Inmate Dobbins had a prison-made knife, inmate Heard had what appeared to be one of the Officers' night sticks, Oscar Johnson had a prison-made knife and inmate Moore had a prison-made knife."
After this, inmate Johnson, the appellant, started hitting a knife against the windowpane and said, "This is no game. We mean business and we are ready and willing to die but we are going to kill some of these mother-_____ pigs before we do." Inmate Dobbins then stated that they wanted to see the Governor's Aide, the Commissioner, Sister Patricia, Sister Williams, Harold Martin and "a black dude that is a representative." Harding said the inmates demanded those people there within five minutes, and that when he told them it was impossible, Dobbins said he knew that it was before he asked it. Dobbins then told Harding, "Just to show you we mean business and we are not joking, we are going to bring up some people that we have already killed. We have already killed some house-niggers and snitches and we are going to show you who they are." Harding stated that he saw two inmates brought up and "that they were mutilated or they had blood all over them."
Warden Harding also testified that he saw the appellant holding a knife at the throat of Officer Dreadin just before the inmates put the piece of cardboard or cloth back over the window. Then the following occurred:
 "I asked Dobbins could we talk some more. He said, `Man, we are through talking. We are not talking anymore.' And someone back in here, some several people talking, says, `Quit talking to the man. Let's get started and get on with what we are supposed to be doing; this is a revolution, man, let's go on and do what we are supposed to be doing.' *Page 668 
"Q. What happened then?
 "A. Dobbins called back and said, `Bring up one of them mother-_____ pigs and let's show the man we mean business.'
"Q. What happened then?
 "A. I heard a commotion back in here and then I heard Officer Dreadin yell and say, `Come in and get me. They have killed one of us and they are killing me now.' At that time he appeared here at the door and I saw Frank Moore stab him as he fell through the door and George Dobbins stabbed him as he come through the door and he fell into the lobby. And George went back this way and we started in after them."
After the Warden and his guards entered, he stated that he saw the appellant, Oscar Lee Johnson, and inmate Johnny Harris leave the Number One cell, the cell where Officer Barrow's body was found.
Jewell F. Thomas, an inmate, testified that he was "hall flunky" with duties similar to a janitor and that the appellant and Johnny Harris were the other two "hall flunkies." Thomas testified that he was in the lobby when he heard someone yell, "This is a revolution." Someone also yelled to inmate Robert York, "This is a revolution — Do you want your cell open," and York said, "Yes." Thomas testified that he (Thomas) was stabbed twenty-two times. He was stabbed first by Dobbins and then Johnnie Wilson, Grover McCorvey, Charles Beasley, Oscar Johnson and Johnny Harris came in and attempted to "cut him up." However, he testified that he could not say which of them was actually cutting him. Sometime later Dobbins instructed California Richie to finish Thomas off and Richie also stabbed him. Jewell Thomas testified that during the riot he saw the appellant and Grover McCorvey pass by his cell at separate intervals, each carrying a bloody knife.
The next State witness was Bruce Etheridge, a correctional officer, who testified as to the help he rendered in removing Officer Barrow from the lock-up area of the prison and getting him into an ambulance. He testified that Barrow was covered with blood and that he stopped breathing during the drive to the hospital in Atmore. Etheridge saw none of the disturbance on the day in question as he arrived on the scene as order was being restored.
Arthur Dreadin, a correctional officer, testified that he was captured and taken hostage along with Officer Luell Barrow. The following appears in the record in regard to the taking of the two guards as hostage:
 "A. And we had already fed supper and was taking up the trays from the inmates and so Johnny Harris and Oscar Johnson, Johnny Harris come out first with a pick and he put it to my back and said not to say anything. And Oscar Johnson had a knife around Mr. Barrow's neck, throat, and told us not to say nare word; did, they was going to kill us. We did not say nothing. They taken our keys, pocket book, watches and pocket knife, all our personal belongings we had on us and then they carried us over on Number Two side, on Number One."
Dreadin testified that the appellant appeared to be one of the six ringleaders. He also stated that the inmates said that the revolution was, "taking over and that they was going to cut our heads off and . . and roll them down the hall." Dreadin testified that he and Barrow were taken to cell Number One in the following manner:
"Q. With these four persons. Where were you standing?
 "A. Standing right in the door. Frank X. Moore was standing in the hall right ahead of me and just kept punching his knife at me and he said he wasn't going to cut me, he just practicing, just kept doing that.
 "Q. Harris, Moore, McCorvey and this Defendant were behind you in the cell with Barrow?
"A. Yes.
"Q. Did you say anything at this time?
"A. No, I didn't.
"Q. Did you see Mr. Barrow at this time? *Page 669 
 "A. I could just see him, just part of him. And so they taken — I saw him. He grunted, groaned like.
"Q. Did any of these inmates have weapons?
"A. They all had knives.
"Q. What kind of knives were they?
"A. Prison-made knives.
 "Q. Did you hear Mr. Barrow say anything while he was behind you in the cell?
 "A. He said `uhh, uhh,' something like that. I saw him going down. I knowed what was happening so I run and Frank Moore was standing right at me. That is when he went to cutting me, stabbing me. I got to the door and that is about as far as I know.
"Q. Did you say anything?
 "A. All I done I hollered for them to come on, get us. `They done killed Mr. Barrow and they cutting me'".
At the close of Officer Dreadin's testimony, the State rested its case. A motion to exclude the State's evidence was overruled, and the defense called its first witness.
William Boyd testified as to the atmosphere existing at Atmore on January 18, 1974. When the defense sought to elicit testimony concerning an unrelated incident at an earlier date with Warden Harding and concerning conditions at the prison, the court held such to be irrelevant and immaterial. It was shown that the witness was not in the segregation unit on January 18, 1974.
Paul Echols testified next for the defense that he was in the segregation unit on January 18, 1974, and testified to the conditions present at the time of the incident. He also testified that he never saw the appellant stab anyone and that Dobbins appeared to be the only leader. Echols stated that he and the rioters were beaten after the quelling of the "rebellion," as he termed it, and that he had been threatened three times by guards seeking to keep him from testifying.
Claude Harris, Jr., testified that he was also in the unit on the day in question and that he had been there for twenty-one days. He, too, described conditions at Atmore Prison. He testified that he did not see the appellant stab anyone. Harris testified that he was hit over the head with a pick handle which required stitches. This witness also stated that Jewell Thomas sold water and extra food to the inmates.
The defense called Jerry White to testify to numerous conditions at the prison and to identify a lawsuit pending in federal court, however, his testimony was not allowed since he was not present on the day of the incident.
J. Andrew Lipscomb, a sociologist and minister, testified next and stated that he found Atmore to be, "one of the worst facilities I have ever had the displeasure of serving." Lipscomb, as Assistant Director of the southern office of the United States Commission on Civil Rights, had the responsibility for a study of the Alabama prison system. This report, sought to be introduced as was Lipscomb's testimony, was not allowed into evidence.
The appellant's mother, Mrs. Eloise Johnson, testified that Oscar Johnson's reputation in the community was "the best."
The appellant, Oscar Lee Johnson, was the final witness to testify. The witness first testified that on January 18, 1974, he did not stab anyone. He described his duties as hall attendant and the conditions there in the segregation unit. Johnson further testified as to the goals of the Inmates For Action (IFA) organization of which he was chairman. He was asked questions as to the whereabouts of Jessie Clancy and as to rumors he had heard concerning what had happened to Clancy. He testified that he was told by an officer, "We are to go down there and beat them niggers and kill them like we did Jessie Clancy."
After meal time, appellant cleaned the food trays into a "slop bucket." The appellant testified that when he went out to put the slop in the bucket, the following took place:
 "A. I grabbed Officer Dreadin, Officer Barrow — whichever one it was. I *Page 670 
grabbed him because I wanted to get to see the Warden. I wanted the Warden to get. . . . I wanted to see these people. We all wanted to see them to let them know what we been living under, physically and mentally. . . ."
After this statement, he testified that he never stabbed, shot or hit Officer Dreadin. He also testified that no time limit was placed on the arrival of the persons they demanded to see. He said that the Warden kept telling them that he did not have time and that he could not get the people there. The appellant testified as to beatings and inhumane treatment inflicted upon the inmates after the incident.
The appellant testified that he had been convicted of a felony three times and that he had been put in "lock-up" because the officials said he was inciting a riot. He also testified as to various educational meetings had by the I.F.A. and that the members called each other "comrade." Concerning their meetings, the appellant testified:
 "A. We use the words of the ill-effects of capitalism. We use the words of the things we can do to better conditions of the things we're living in and the conditions of population; how to stop ripping off the young people coming in; to kill homosexuality and the use of dope. . . ."
The testimony established the segregation unit to be a maximum security unit for inmates that create disciplinary problems among the regular prison population. Prisoners are not segregated on the basis of race.
 I
Appellant contends that there was a systematic exclusion of blacks and women from the jury roll from which the grand jury was drawn, therefore, the indictment and venire should have been quashed. Appellant asserts that his pretrial motion to quash contained substantial allegations in that regard and should have been granted.
Appellant's motion to quash was based upon the same statistical data as that used in the Harris case, supra. In order to show the racial composition of the Escambia County jury roll, Diana Hicks, a college student and part-time law clerk for Johnny Harris' attorney, took a sample that consisted of the last 451 names on the jury roll. The jury roll in that county normally consists of around 4,000 names.
A statistical analysis of the sample was compiled by a statistician, Dr. Joseph Van Matre. From the random sampling, appellant alleges that only 10.6% of the people on the jury roll were black, while blacks constitute 27.2% of the population of Escambia County eligible for jury duty. He contends that approximately 35.5% of the names from which the grand jury was selected were names of women, whereas they constitute 50% of the population of the county. Appellant contends that the random sample of 451 names out of some 4,000 on the jury roll was sufficient to establish an underrepresentation of blacks and females requiring the indictment and venire to be quashed. The trial court disagreed and overruled appellant's motion to quash.
In White v. State, 48 Ala. App. 111, 262 So.2d 313, Judge Tyson, speaking for this Court, stated:
 "The law is clear that a defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his own race on the jury which tries him, nor on the jury roll from which grand and petit jurors are selected. Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839."
In Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824,13 L.Ed.2d 759, the United States Supreme Court, in ruling on a similar question from Talladega County, failed to find that the statutory method of the jury selection there resulted in purposeful discrimination based on race. The Court recognized that venires drawn in the same or similar manner as in the instant case contain a smaller proportion of blacks than whites in *Page 671 
the community. The Court went on to state:
 ". . . But a defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury which tries him nor on the venire or jury roll from which petit jurors are drawn. . . . Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group. . . . We cannot say that purposeful discrimination based on race alone is satisfactorily proved by showing that an identifiable group in a community is underrepresented by as much as 10%. . . ." (Citations omitted.)
The Supreme Court stated further:
 ". . . There is no evidence that the commissioners applied different standards of qualifications to the Negro community than they did to the white community. Nor was there any meaningful attempt to demonstrate that the same proportion of Negroes qualified under the standards being administered by the commissioners. It is not clear from the record that the commissioners even knew how many Negroes were in their respective areas, or on the jury roll or on the venires drawn from the jury box. The overall percentage disparity has been small, and reflects no studied attempt to include or exclude a specified number of Negroes. Undoubtedly the selection of prospective jurors was somewhat haphazard and little effort was made to ensure that all groups in the community were fully represented. But an imperfect system is not equivalent to purposeful discrimination based on race. We do not think that the burden of proof was carried by petitioner in this case." (Footnote omitted.)
See also Mitchell v. Johnson, 250 F. Supp. 117 (M.D.Ala. 1966);White v. Crook, 251 F. Supp. 401 (M.D.Ala. 1966); Carter v.State, 53 Ala. App. 43, 297 So.2d 175; King v. State,53 Ala. App. 160, 298 So.2d 92; Brantley v. State, 55 Ala. App. 493,317 So.2d 337.
In Harris v. State, supra, we quoted from Butler v. State,285 Ala. 387, 232 So.2d 631, wherein our Supreme Court stated:
 "The burden of proof is on the person attacking selection procedure to show `the existence of purposeful discrimination' by the exclusion of Negroes on account of race from jury participation. . . . Purposeful discrimination may not be assumed or merely asserted. It must be proved. . . ." (Citations omitted.)
There is no proof in the instant case that the opportunity existed for the jury commissioners to subjectively discriminate on the basis of race or sex. Neither was there evidence of a past pattern of discrimination in jury selection in Escambia County. Based upon the above cited authority and our expressions in the Harris case, supra, on the identical issue, we find that the appellant's motion to quash and affidavit in support thereof falls considerably short of the proof necessary to establish purposeful discrimination. The trial court, therefore, did not err in overruling appellant's motion.
 II
Appellant contends that the trial court erred in overruling his motion that he be present at the hearing of his preliminary pretrial motions. Preliminary motions hearings and pretrial motions hearings are not viewed by this Court as a "critical stage" of the trial. Berness v. State, 263 Ala. 641,83 So.2d 613. 23 C.J.S. § 974 states in pertinent part:
 "The trial does not embrace every procedural and administrative step and judicial examination of every issue of fact and law during the trial, and accused's presence is not necessary during proceedings which are no part of the trial, such as preliminary or formal proceedings or motions which do not affect his guilt or innocence. . . .
 "It has been held that accused's presence is not necessary at the hearing and determination *Page 672 
of a demurrer to the indictment or information, of a motion to quash the same, of a plea in abatement, or of a motion for leave to file an information, or to summon witnesses, or to amend the information . . . or of other motions. . . .
 ". . . Thus, the exclusion of accused during conferences of court and counsel on questions of law, at the bench or in chambers, has been considered not to constitute a denial of the right of accused to be present at every stage of the trial. . . ." (Footnotes omitted.)
Also see: State v. Neal, 350 Mo. 1002, 169 S.W.2d 686; RosebudCounty v. Flinn, 109 Mont. 537, 98 P.2d 330.
 III
Appellant contends that the trial court's voir dire examination of prospective jurors was inadequate and that denial of this motion for individual counsel-conducted voir dire constituted error.
It is well settled in Alabama that the trial court has the discretion as to how voir dire examination of the venire will be conducted. Beecher v. State, 288 Ala. 1, 256 So.2d 154
(reversed on other grounds, 408 U.S. 234, 92 S.Ct. 2282,33 L.Ed.2d 317); Thigpen v. State, 49 Ala. App. 233, 270 So.2d 666;McPhearson v. State, 271 Ala. 533, 125 So.2d 709.
The trial court allowed the defense to submit questions "to the court for its consideration one day before the qualifying of jurors," and the trial judge also allowed additional questions during the qualification of jurors, "if the response to the original questions pronounced by the Court seems to justify such additional questions." We find no abuse of discretion by the trial court in following such procedure. Title 30, § 6, Code of Alabama 1940, requires the trial judge to ascertain that the jurors possess the qualifications required by law, and Title 30, § 52, allows either party the further right to examine jurors, "under the direction of the court." The trial court may conduct the voir dire examination of the venire and refuse to allow defense counsel to personally interrogate each prospective juror. Aaron v. State, 273 Ala. 337, 139 So.2d 309, cert. denied, 371 U.S. 846, 83 S.Ct. 81,9 L.Ed.2d 82.
 IV
Appellant contends that his denial of a preliminary hearing and of a bill of particulars should be grounds for reversal of his conviction.
A preliminary hearing is not a required procedure in a criminal prosecution and no right to such exists in Alabama after indictment. Coleman v. Alabama, 399 U.S. 1,90 S.Ct. 1999, 26 L.Ed.2d 387; Ex parte Campbell, 278 Ala. 114,176 So.2d 242; Rhodes v. State, 50 Ala. App. 661, 282 So.2d 100.
An accused is not entitled to a bill of particulars under Alabama law. Even in jurisdictions where the granting of a bill of particulars is permissible, such rests within the discretion of the trial judge. In Jones v. State, 136 Ala. 118,34 So.2d 236, our Supreme Court, at p. 238 stated:
 ". . . Whatever may be the practice in those jurisdictions with respect to demanding a bill of particulars in criminal cases . . . the practice has never prevailed in this State, and we would be unwilling to introduce into it such an innovation. . . ."
Also see Danley v. State, 34 Ala. App. 412, 41 So.2d 414, cert. denied 252 Ala. 420, 41 So.2d 417, and Kennedy v. State,39 Ala. App. 676, 107 So.2d 913.
 V
The appellant contends that the evidence was insufficient to support a conviction for "aiding and abetting" in the homicide because there was no evidence that the actual perpetrator knew of the appellant's presence or willingness to assist.
The testimony of at least three witnesses for the State amply supports appellant's conviction. Warden Harding, Officer *Page 673 
Dreadin and Jewell Thomas, establish in their testimony that appellant was not only a participant in the riot, but was a leader. Their testimony established that appellant was at all times in the segregation unit where the riot occurred, that he was armed with a knife and participated in holding hostages. Testimony also placed appellant in the very cell where the deceased was stabbed to death. Testimony likewise portrayed appellant as holding a knife to the throat of a correctional officer.
The trial court properly instructed the jury that conspiracy need not be proved by positive testimony. Circumstantial evidence may be considered by a jury in determining whether or not a conspiracy existed. Stokley v. State, 254 Ala. 534,49 So.2d 284; Goodman v. State, 52 Ala. App. 265, 291 So.2d 358;Parsons v. State, 33 Ala. App. 309, 33 So.2d 164.
The trial court's charge, in this regard, came directly from the following Alabama cases: Davis v. State, 36 Ala. App. 573,62 So.2d 224; Ray v. State, 32 Ala. App. 556, 28 So.2d 116. Appellant cannot rely upon the argument that he cannot be treated as a coconspirator or accessory to the crime unless the principal knew of his presence and willingness to aid and abet in the criminal act. That rule, stated correctly, is that mere presence alone, where there was no prearrangement or preconcert, is insufficient to establish a conspiracy, "unless the principal knew of the presence, with intent to aid, of such person." Raiford v. State, 59 Ala. 106; State ex rel. Martin v.Tally, 102 Ala. 25, 15 So. 722; Morris v. State, 146 Ala. 66,41 So. 274.
Here, there was much more than the appellant's mere presence at the scene of the crime to support the finding of the jury that Oscar Johnson aided and abetted in the homicide. Whether appellant aided and abetted in the murder was a question for the jury, and we are of the opinion that the evidence was sufficient to go to the jury on this question. Davis, supra.
 VI
Appellant contends that the trial court should have excluded the testimony of Jewell Thomas, "particularly as it related to stabbings," as its prejudicial nature was so high in relation to its probative value as to make such evidence inadmissible.
It is a well-established principle that evidence of other or collateral crimes is not admissible as substantive evidence to establish the guilt of an accused of a particular crime. To this well-established rule, there are several equally well-established exceptions. Wharton's Criminal Evidence, § 31, lists them as follows:
 "These exceptions fall under the following general divisions: (1) Relevancy as part of res gestae. (2) Relevancy to prove identity of person or of crime. (3) Relevancy to prove scienter, or guilty knowledge. (4) Relevancy to prove intent. (5) Relevancy to show motive. (6) Relevancy to prove system. (7) Relevancy to prove malice. (8) Relevancy to rebut special defenses. (9) Relevancy in various particular crimes. It is recognized that in many instances the line of demarcation is not clear, but the discretion vested in the trial judge, intelligently and considerately exercised, will enable the prosecution fully to present the charge, on the one hand, and, on the other hand, to protect the accused and secure to him the rights guaranteed to him by the Constitution and the laws."
See Murphy v. State, 52 Ala. App. 490, 294 So.2d 457; Brasher v.State, 33 Ala. App. 13, 30 So.2d 26, cert. denied 249 Ala. 96,30 So.2d 31.
The stabbing of Jewell Thomas, as well as the other acts of violence enumerated in the evidence, were a part of the whole or same occurrence and thus could be considered by the trial court as relevant as a part of the res gestae. Also see McElroy, The Law of Evidence in Alabama, Vol. 1, § 69.01 (3), p. 167; Keith v. State, 253 Ala. 670, 46 So.2d 705; Grant v.State, 250 Ala. 164, 33 So.2d 466. *Page 674 
 VII
Appellant contends that the court should have allowed testimony concerning the conditions at the prison. He argues in brief such conditions gave rise to the incidents which ultimately resulted in the instant prosecution. We cannot agree with such contention. The conditions in the Alabama penal system, and more particularly in the Atmore Prison, are not relevant to the issue of whether or not the appellant killed Luell Barrow.
At any rate, testimony was injected throughout the trial concerning the prison conditions. Such testimony came from Jewell Thomas, Paul Echols and from the appellant himself. However, the testimony of Warden Harding bears mentioning in that it tends to show that the prison conditions were not the cause of the riot.
Warden Harding described his conversation with inmates George Dobbins and Oscar Lee Johnson at the very beginning of the riot:
 "When the cardboard was removed and I saw, I asked George Dobbins who was standing at the window along with inmate Oscar Johnson, I asked Officer (sic) Dobbins what his problem was. He stated to me he didn't have a problem, that I had a problem. That they were not bitching about the food nor the conditions of the prison, that this is a revolution and the revolution was on." (Emphasis supplied.)
 VIII
Appellant contends that the circumstances surrounding the death of inmate George Dobbins should have been admitted as part of the res gestae.
Whether testimony is part of the res gestae is a matter to be determined by the court on a case-by-case basis, and there is no hard and fast rule for making such a determination. Price v.State, 41 Ala. App. 239, 128 So.2d 109. As previously stated, the testimony of Jewell Thomas was admissible since his stabbing was a part of the whole or same occurrence. The time is significant in this instance since the death of Dobbins occurred after the death of Officer Barrow and occurred a substantial period of time after the uprising had been quelled. The circumstances surrounding the death of inmate Dobbins failed to meet the requirements set forth in Murphy v. State,42 Ala. App. 60, 63, 151 So.2d 800:
 "The general rule is that acts or declarations are admissible as part of the res gestae if they are `substantially contemporaneous with the main fact under consideration, and so closely connected with it as to illustrate its character.' . . ." (Citations omitted.)
Appellant convinced neither the trial court nor this Court that the circumstances surrounding the death of George Dobbins have any relevant bearing upon the issue being decided in the instant case.
 IX
The appellant insists that the trial court erred in cutting off the testimony of Claude Harris which would have impeached Jewell Thomas by showing Thomas to have been biased and guilty of the illegal conduct of selling food and water to inmates. Appellant argues that the judge put an end to the line of questioning which would have tended to accuse Thomas of illegally selling food and water to inmates.
This argument can be disposed of on the basis of a reading of the record. The record discloses that the witness was allowed to testify concerning the selling of such food and water. It was only when defense counsel asked the collateral question, "How was the food back at that time in this area?" that the judge sustained an objection. Such ruling did not cut off further questions concerning the selling of food and water by Jewell Thomas, and the record fails to show that defense counsel could not have propounded further questions along those lines had he so desired. *Page 675 
 X
Appellant contends that the trial court limited his access to possible witnesses to only those prisoners who were present at the time and place the crime was committed. He argues that such a restrictive ruling effectively barred access to impeachment witnesses. Again, a reading of the record will not support the appellant's contention in this regard. The ruling of the trial court appears in Volume I, p. 80, of the record:
 "THE COURT: Anybody that is a material witness they can see. If they are talking about people who went into the system after this all happened, I will have to be shown the basis."
We find no error in the trial judge's refusal to turn the keys of the prison over to defense counsel to roam at will, interviewing inmates who were not even in the prison system at the time the crime occurred. It is clear from the trial court's statement above that all material witnesses were available to the defense, and further that inmates not in the system at the time of the crime could possibly be interviewed if the defense showed the trial judge a valid basis for such. We find no error in this.
 XI
Appellant asserts that he was never properly informed of the charges against him. In addition to his contention that denial of a preliminary hearing and of a bill of particulars was a violation of his rights, he attacks the indictment as being conclusory and uninformative in its wording.
We have disposed of his argument concerning denial of a preliminary hearing and of a bill of particulars in IV, ante.
The proper method of reaching defects in an indictment is by demurrer and not by motion to quash. Boulo v. State, 49 Ala. 22; Daniel v. State, 149 Ala. 44, 43 So. 22.
The indictment, attacked by the appellant, follows Code Form 79 as set out in Title 15, § 259, Code of Alabama 1940, and therefore sufficiently informed the appellant of the charges against him. Indictments which substantially follow the form set out in the Alabama Code have been held to be sufficient since the earliest days of our judicial system. Duncan v.State, 278 Ala. 145, 176 So.2d 840; Sanders v. State, 278 Ala. 453, 179 So.2d 35; Jones, supra.
 XII
Appellant contends that before trial, the trial judge examined, in camera, some sixty to seventy statements obtained by state investigators. Appellant contends that after reviewing such statements, the trial judge would have been biased against him.
In view of the appellant's pretrial motions for discovery and his demands for production of such statements, we find nothing improper in the trial judge's action in reviewing such material. Judge DeCarlo, in a lengthy and well researched opinion on the subject of judicial bias wrote, in the case, Inre White, 53 Ala. App. 377, 300 So.2d 420, cert. denied 293 Ala. 778, 300 So.2d 439:
 "The bias of prejudice which will disqualify must be `personal' as distinguished from `judicial' bias. `Personal', as contrasted with `judicial', characterizes an attitude of extra-judicial origin, derived non coram judice. Craven v. United States, 1 Cir., 22 F.2d 605."
Appellant fails to make any showing of a bias on the part of the trial judge which would work a recusal or disqualification pursuant to the standards set out in White, supra.
 XIII
Appellant contends the trial court erred in denying his motion for change of venue.
Filing a motion for change of venue pursuant to Title 15, § 274, Code of Alabama 1940, the appellant has the burden to prove that he could not receive a fair and impartial trial in Escambia County. Mere allegations of widespread publicity or of *Page 676 
racial or economic prejudice is insufficient. It has likewise been held that the mere introduction of newspaper articles is insufficient without a showing to the trial judge what effect such articles would have on the venire. Beddow v. State,39 Ala. App. 29, 96 So.2d 175, cert. denied 266 Ala. 694,96 So.2d 178; Aycock v. State, 50 Ala. App. 130, 277 So.2d 404, cert. denied 291 Ala. 49, 277 So.2d 412.
A motion for change of venue is addressed to the sound discretion of the trial judge, and his rulings will not be disturbed on appeal, absent a showing of abuse of discretion.Cobern v. State, 273 Ala. 547, 142 So.2d 869; Yoemans v. State,55 Ala. App. 160, 314 So.2d 79. From a review of the record, we find that the appellant failed to meet the burden of proof necessary to support the motion for a change of venue, and we fail to find an abuse of discretion on the part of the trial judge in denying the same.
 XIV
Appellant urges that he was a victim of selective enforcement and thus was denied equal protection of the laws.
In 1962, the United States Supreme Court, in the case ofOyler v. Boles, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446, said:
 ". . . the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation. Even though the statistics in this case might imply a policy of selective enforcement, it was not stated that the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification. Therefore, grounds supporting a finding of a denial of equal protection were not alleged. . . ." (Citations omitted.)
We take judicial notice that appeals have been taken to this Court from the convictions of at least four inmates participating in the Atmore Prison riot. Whether the State had sufficient proof to bring successful prosecutions against other inmates is not known to us. However, we do know from reading the record in the instant case that the appellant was a ring leader in the so-called revolution and that the testimony against him as such is amply sufficient to support the instant prosecution for murder directly or under Title 14, § 14, Code of Alabama 1940, as an accomplice.
No one reading the record could logically come to the conclusion that appellant was being tried because of the color of his skin or because of a religious belief, or because of some other unjustifiable standard or arbitrary classification. It is evident from the record that appellant was tried because he participated in the cold blooded, savage murder of Luell Barrow.
 XV
Appellant claims the denial of funds to pay defense expenses for investigators and assistance of experts amounts to a denial of equal protection of the law.
In Tillis v. State, 292 Ala. 521, at p. 525, 296 So.2d 892, at p. 895, our Supreme Court stated:
 "The defendant makes the argument that because of his indigency, he was not able to adequately investigate or procure witnesses in his defense, and the State does not award sufficient funds to pay an attorney and do those things, too. To be sure an indigent defendant is in a difficult position. This question has been raised before. Wheeler v. State, 47 Ala. App. 457, 256 So.2d 197 (1971). While some provisions are made for this in the federal system, it is not the present situation in this State. . . ."
Title 18, § 3006A (e), U.S.C.A., provides financial assistance to indigent defendants to obtain investigative, expert or other services necessary for an adequate defense. Other states, such as California, provide for such assistance, however, the Alabama legislature has not enacted such a statute in this state. As stated in Harris v. State, supra, "Appellant was not denied due process where the state did not provide funds for the employment of a special investigator *Page 677 
to aid him in procuring witnesses in his defense. . . ."
 XVI
Appellant alleges error on the part of the trial judge in denying his request for discovery of: statements taken by state investigators; criminal and psychiatric records; grand jury minutes; prisoner "jackets"; findings of investigatory meetings; and information to support a jury challenge.
The trial judge reviewed, in camera, the statements taken by state investigators as per Brady v. Maryland, 373 U.S. 83,83 S.Ct. 1194, 10 L.Ed.2d 215. The United States Supreme Court in 1972 explained the Brady decision, in part, in Moore v.Illinois, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706, as follows:
 "The heart of the holding in Brady is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence. These are the standards by which the prosecution's conduct . . . is to be measured.
* * * * * *
 "We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case. . . ."
Limitation on prosecutory suppression of evidence was set out in Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763,31 L.Ed.2d 104 and paraphrased as follows in Shuler v. Wainwright, 5 Cir., 491 F.2d 1213 (1974):
 "(1) Deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice. The same results obtain, when the State, although not soliciting false evidence, allows it to go uncorrected when it appears;
 "(2) When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within the rule;
 "(3) The rule however does not automatically require a new trial whenever a combing of prosecutors' files after trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict (emphasis ours). A new trial is required if false testimony could in any reasonable likelihood have affected the jury."
We fail to find a violation of any of the above standards in the instant case on the part of the prosecution. We find no evidence on this appeal that any evidence was suppressed which could have devalued the strong case the state proved against the appellant, "that would have led the jury to entertain a reasonable doubt of the defendant's guilt." United States v.Teague, 7th Cir., 445 F.2d 114 (1971). Neither are we convinced from appellant's assertions that the material sought was, "so material to the guilt or innocence of the accused that he wasdenied a fair trial under the teachings of Brady v. Maryland. .. ." Shuler, supra; Davis v. Heyd, 5th Cir., 479 F.2d 446.
The standards set out in Brady and Moore, supra, do not subject a prosecutor in a state criminal proceeding to a "scattergun" motion to produce, nor to a motion amounting to a mere "fishing expedition" by a defendant. McCants v. State,282 Ala. 397, 211 So.2d 877; Sanders v. State, 278 Ala. 453,179 So.2d 35; Mabry v. State, 40 Ala. App. 129, 110 So.2d 250, cert. denied 268 Ala. 660, 110 So.2d 260; Thigpen v. State,49 Ala. App. 233, 270 So.2d 666; Hurst v. State, 54 Ala. App. 254,307 So.2d 62, cert. denied 293 Ala. 548, 307 So.2d 73. We find no abuse of discretion on the part of the trial court in denying appellant's requests. Maness v. State, 57 Ala. App. 431,329 So.2d 120 cert. denied 295 Ala. ___, 329 So.2d 126 (1976). *Page 678 
 XVII
Appellant contends that the trial tactics and inflammatory comments of the prosecution deprived him of a fair trial.
We have reviewed each comment of the prosecution which appellant argues were improper and which had the cumulative effect of inflaming the jury. In each instance, the trial judge sustained appellant's objection or else the comment or question was withdrawn by the state and no ruling of the court was invoked. On several occasions, the trial judge admonished the jury to disregard the comment or gave other corrective instruction.
This Court will only be persuaded to a reversal on such an allegation where the prosecutor's comments go to prejudicial matters not in evidence which either cannot be eradicated from the minds of the jurors, or being eradicable, where the trial judge overrules objection thereto or fails to properly instruct the jury. Allred v. State, 291 Ala. 34, 277 So.2d 339 (1973). Comments, even though hard hitting, which may arise from reasonable inferences from the evidence are permissible. To quote from Arant v. State, 232 Ala. 275, 167 So. 540:
 "Counsel for the state and defendant are allowed a rather wide latitude in drawing their deductions from the evidence . . .
* * * * * *
 ". . . Such statements are usually valued by the jury at their true worth . . . and not expected to become factors in the formulation of their verdict. . . .
* * * * * *
 ". . . But, after all, we must not lose sight of the fact that a trial is a legal battle, a combat in a sense, and not a parlor social affair. . . ." (Citations omitted.)
We find no reversible error in this regard.
 XVIII
Appellant's contention that the trial court erred to a reversal in charging the jury as to the death penalty is without merit. This Court as recently as 1974 held it was not reversible error to charge the jury on the death penalty where the accused was indicted for first degree murder, but was convicted by the jury of second degree murder. Goodwin v.State, 53 Ala. App. 498, 301 So.2d 261 and numerous cases cited therein.
AFFIRMED.
TYSON, HARRIS and DeCARLO, JJ., concur.