LEIGH M. CLARK, Retired Circuit Judge.
This appellant was convicted of murder, infanticide, the alleged victim being a four-month-old child, Carrie Joann McKinley, who, according to the undisputed evidence, was the daughter of defendant’s wife, who during their marriage had previously given birth to defendant’s son, who was eighteen months old at the time of the alleged murder. Any doubt as to the paternity of the alleged victim is dissolved by the sworn admission of the defendant’s wife and the fact the child was conceived during a considerable period of time while the defendant was confined in a prison. Since their marriage, the defendant and his wife had lived in states other than Alabama. In June 1981 they were traveling as paid passengers in a bus and had brought the two children with them. Some time between the last previous stop of the bus and the stop it made in Birmingham, Alabama, the older child sustained a fall on the bus. Upon arrival in Birmingham and consultation with the bus station attendants, all four were transported by a taxi to a hospi *1041 tal, from which they went to the Children’s Hospital. Some time before midnight that night, after defendant and his wife had counselled with one another as to where all but the hospitalized child should spend the night, the defendant and Carrie Joann McKinley went to a downtown motel, the “Holiday Inn, Civic Center.” According to the testimony of the defendant, the following then occurred:
“Q. Okay. Now, Larry, tell me what happened, what really happened when you went to the motel?
“A. Okay. When I went to the motel I had my hands with the baby in the carrier [the not unusual type of device used for the carrying of a baby] there and also I had some other stuff, her clothes and her milk and some sacks with some stuff for us to change. And as I was trying to unlock the door [the door of the room they were to occupy] she had pushed out of the carrier on me and had fell.
“Q. And where did she fall?
“A. She fell on the concrete by the building and the molding there beside the building.
“Q. Okay. What time of the day was this, now?
“A. This here was at night. I would say approximately five or ten minutes of twelve or somewhere in there.
“Q. Okay. What time had you left— What time had you started this journey?
“A. I would imagine somewhere around 11:45 going over to the motel.
“Q. About how far did she fall?
“A. I’m not really sure. It was probably anywhere from two and a half to four feet, three and a half. I’m not sure on that height.
“Then she was crying a little bit. So, I went ahead and throwed my stuff down right there at the door. And I took her in and lay her on the bed.
“Q. Okay. Tell us what happened next.
“A. Well then, in the process I had hit the baby twice.
“Q. Okay. How did you hit the baby?
“A. Open handed.
“Q. Okay. Did you close your fist and hit the baby?
“A. No, sir. I did not.
“Q. How hard did you hit the baby? “A. It wasn’t very hard at all.
“Q. Okay. Now, what else did you do?
“A. Then right after that I noticed she was catching her breath. And then I couldn’t get her straightened out. That’s when I really got nervous and upset about the whole situation. And I picked her up, and I had laid her against me, my body.
“Q. Okay.
“A. And as far as shaking her, I had shaken her but not violently, because I didn’t have her that far from my body.
“Q. Okay. After that happened what happened to the baby?
“A. Well, she was limp. I was trying to — Then I had called my wife about trying to get — Asked her what to do in a situation like this. And she said get a cold wet cloth and wipe her face with it. And that’s what I done. And I couldn’t—
“Q. And then what happened:
“A. I couldn’t get no response from the baby. And that’s when I called the Paramedics for some help.”
Thereafter, according to the undisputed evidence, paramedics came to the motel; officers also came; it was determined that the child was in critical condition; she was removed to a hospital and soon thereafter was pronounced dead. There was no eyewitness, other than the defendant, to what happened to the child while defendant and the child were in the process of entering the room at the motel.
The first witness called by the State on the trial of the case was the wife of defendant. Her testimony revealed mixed emotions on her part as to whether defendant was guilty of the murder of her four-month-old child. Defendant’s attorney on cross-examination of her attempted to get her to admit that she herself had been *1042 guilty of an abuse of the deceased child. Some of her testimony formed some basis for the contention of defense that the death of the infant was partly attributable to physical mistreatment by the infant’s mother.
By far the strongest evidence against the defendant was that of Dr. Linda Norton, an Associate Professor of Pathology at the University of Alabama in Birmingham and an Associate Chief Medical Examiner for Jefferson County, who performed an autopsy on the alleged victim and who had “examined the child either a day or two days prior to death at Children’s Medical Center.” She testified at length and in detail to the effect that the child was intentionally killed while it was admittedly in the possession of the defendant. She said:
“Barring the history of the child falling from three or four stories out of the window, and barring the history of the child being thrown from a moving motor vehicle and coming to rest outside the car. The only other instance where this type or this magnitude of damage occurs is when an adult individual or someone of adult statute [which we construe as stature] takes a child, picks him up by the feet, the legs, waist, and uses this child’s head as the end of a whip with their own shoulders as the fulcrum and slams them into either a hard surface or onto the floor, or slings them across the room
There is no contention by appellant that the evidence was not sufficient to present a jury issue as to the guilt of defendant, and we see no reasonable basis for such a contention. However, Dr. Carl R. Robinson, who testified that he practices “medicine, among other things, in Bessemer, Alabama,” testified as a witness for the defendant and expressed disagreement with the conclusion of Dr. Norton as to the cause of the child’s death. In Dr. Robinson’s testimony he said, inter alia, that in his opinion the child “could ... have sustained those injuries falling two and a half to three feet ... onto a concrete surface, say, in a hotel room.”
Appellant presents two principal contentions for a reversal. The first is thus captioned:
“The denial of funds for an indigent defendant for expert witnesses denies the defendant of due process, equal protection, and effective assistance of counsel.”
Contrary to appellant’s contention is the following:
“... It has been repeatedly held that a denial of funds to pay defense experts for investigators and the assistance of experts does not amount to a deprivation of Constitutional rights. Harris v. State, Ala.Cr.App., 352 So.2d 460, affirmed, Ala., 352 So.2d 479 (1977); Johnson v. State, Ala.Cr.App., 335 So.2d 663, cert. denied, Ala., 335 So.2d 678, cert. denied, 429 U.S. 1026, 97 S.Ct. 649, 50 L.Ed.2d 629 (1976); Tillis v. State, 292 Ala. [521] 526, 296 So.2d 892 (1974).” Thigpen v. State, Ala.Cr.App., 372 So.2d 385, 386 (1979), writ denied, 372 So.2d 387.
That the law on the subject is not uniform throughout the United States is to be readily observed from 34 A.L.R.3d, 1256-1297 (1982 Supp.). The contrariety of opinions is largely attributable to the variety of statutory provisions on the subject in the various jurisdictions, including particularly the jurisdiction of Courts of the United States. The federal cases cited by appellant in support of his contention are readily distinguishable, for that a provision for funds for the hiring of expert help in criminal cases against indigents is mandated by 18 U.S.C. § 3006A(e). Somewhat analogous statutes have been enacted in several of the constituent states of the United States. The only Alabama statute that could be considered to be on the subject is Code of Alabama 1975, § 15-12-21(d), as follows:
“Counsel appointed in cases described in subsections (a), (b), and (c) above, including such cases tried de novo in circuit court on appeal from a judgment proceeding, shall be entitled to receive for their services a fee to be approved by the trial court. The amount of such fee shall be based on the number of hours spent by the attorney in working on such case and *1043 shall be computed at the rate of $40.00 per hour for time expended in court and $20.00 per hour for time reasonably expended out of court in the preparation of such case. The total fees to any one attorney in any one case, from the time of appointment through the trial of the case, including motions for new trial, shall not, however, exceed $1,000.00. Counsel shall also be entitled to be reimbursed for any expenses reasonably incurred in such defense to be approved in advance by the trial court, but in no individual case shall such expenses exceed one-half of the allowable attorney’s fees provided in this section.” (Emphasis supplied).
The effort of defendant to obtain funds from the State for hiring of experts was commenced by a “Motion for Funds for Experts,” which motion was heard by Circuit Judge Joseph J. Jasper, who was not the judge presiding over the trial of the case. In the brief of counsel for appellant, it is stated, “It is Appellant’s position that the reason said motion was denied was because of an erroneous belief by the Circuit Judge that he had no authority based on Alabama case law to authorize such funds.” Whether such was the trial court’s reason for its denial of the motion, we do not know, but we are unwilling to assume that such was the reason. We think of a good reason, viz., that the trial court probably determined that appellant’s motion, as well as his position on the hearing of the motion, was so vague, indefinite and incomprehensible as to its objective that it could not with propriety have been granted. The first paragraph of the motion is as follows:
“Comes now the indigent defendant, Larry W. McKinley, and moves this Honorable Court for an order allowing him to expend State funds in order to hire either a psychiatrist or psychologist, a hypnotist and a pathologist. As grounds for said motion the following is submitted.”
The motion was filed on December 10,1981, by defendant’s appointed attorney, who continues to represent him on appeal. Defendant was arraigned on July 31, 1981, at which time an attorney was appointed for him by reason of his indigency and the case was set for trial on February 8, 1982. The attorney appointed at the time of arraignment requested that he be allowed to withdraw as counsel, which request was granted, and his present attorney was appointed on November 6, 1981. The motion contains an allegation that “defendant has been unable to remember all of the details of the alleged incident and a hypnotist would be helpful to the undersigned counsel in order to prepare a proper defense.” There is also an allegation that his counsel “cannot determine whether or not to plead the defendant not guilty by reason of insanity without first having an evaluation of the defendant by a trained psychologist or psychiatrist.” In addition, it is alleged in the motion that medical reports concerning the death of the victim “are not within the knowledge and expertise of the appointed counsel” and “it is necessary to obtain the services of a qualified pathologist or similarly trained expert to aid in the interpretation of said medical reports.”
On the hearing of defendant’s motion for funds for experts, defendant called “a clinical psychologist and hypnotherapist” with the Motivation and Hypnosis Center in Birmingham, who testified, inter alia, that their “regularly hourly rate is $50 for each consultation hour” and that some others of the same profession “charge as much as $100 an hour.” The attorney for defendant, his present attorney, also testified on the motion for funds for experts. His testimony was to the effect that he had had considerable difficulty in communicating with defendant and that he needed the services of the experts designated in his motion for funds as guidance for the attorney in either advising a plea of not guilty by reason of insanity or in attempting to disprove the claim of the State as to the cause of the alleged victim’s death. The hearing on defendant’s motion for funds for experts was conducted on January 29, 1982, barely one week before the case was set for trial on February 8, 1982, which trial was commenced about 2:30 P.M. on that day.
*1044 Although the position taken by defendant’s attorney on the hearing of the motion for funds for experts was commendably self-effacing and manifestly taken in a dedicated effort to do all that could be done for the client, it lacked specific objectivity as to anything that could have been within the power of the trial court to grant the defendant. Furthermore, it is to be observed that between the date of the hearing of the motion and the time of the trial of the case, defendant’s counsel achieved extraordinary proficiency in defending his client, in communicating with him and in the presentation of expert testimony by Dr. Robinson in an effort to counteract the testimony of Dr. Norton. We doubt not that the fact that Dr. Robinson was not a pathologist had a tendency to cause the jury to give less credence to Dr. Robinson’s testimony than to Dr. Norton’s testimony, but there is nothing to show that defendant would have been benefited by the testimony of a pathologist or by funds with which to employ a pathologist.
It is also to be noted that at the time of the trial, the defendant had no difficulty in remembering and reciting all of that to which he testified. His testimony was clear and comprehensible as to material events preceding the incident, as to the details of the occurrence when the alleged victim was injured while defendant was in the process of opening the door to the room at the motel, and as to all material facts done and observed by him thereafter. There is no semblance of any basis for a plea of not guilty by reason of insanity, or the like, other than that which is contained in the motion for funds for experts and what defendant’s attorney said on the hearing of said motion.
Although, as noted above, the hypnotherapist expressed an opinion on the hearing of a motion for funds for experts as to the charge per hour for services in that field, no explanation was ever given as to the overall funds requested or needed by defendant for the payment of experts in the three separate fields embraced in defendant’s motion. As to any pathologist who would have testified on call of the defendant as to the cause of the alleged victim’s death, the trial court was not presented with any evidence or showing that the testimony of any pathologist would have been favorable to the defendant on the point.
Neither in the motion for funds for experts nor on the hearing of the motion did the defendant specifically request funds pursuant to the last sentence of Code of Alabama 1975, § 15-12-21(d), which we have quoted and emphasized hereinabove and which constitutes the only statutory authority for the State’s payment of funds for experts.
The trial court was not in error in denying defendant’s “Motion for Funds for Experts.”
The other principal contention advanced by appellant is as follows:
“A defendant has an absolute right to a preliminary hearing and the denial violates the separation of powers clause of the Alabama Constitution and equal protection of laws.”
This contention also is nebulous. It did not surface until the date of the hearing of defendant’s motion for funds for experts, January 29, 1982, more than six months after the return of the indictment and defendant’s arrest thereon. The transcript shows that after Judge Jasper’s denial of defendant’s motion for funds for experts, the following occurred:
“MR. APPELL: And we would ask you to rule on Richard Jaffe’s [defendant’s former appointed attorney], now mine by taking it over, motion for a preliminary hearing, which he timely filed in this case.
“THE COURT: I don’t have a motion for a preliminary hearing in here.
“MR. APPELL: I have a copy of it, a stamped copy of it, Judge, that Richard gave me. Do you have any objection to us going to Judge Nice when we get through?
“MR. CAHILL [State’s attorney]: No. Your Honor, I don’t think Mr. Jaffe ever filed that motion demanding a preliminary hearing in the Circuit Court because *1045 I have a letter from him after we had had the session in our office that since the case, as far as witnesses will be very-short, with Dr. Norton and Sergeant Milton, that we will give him everything we had and let him talk to those two witnesses.
“THE COURT: It shows filed, July 24. But that’s in the District Court. It was never filed with the Circuit Court. It shows up there in the corner.
“MR. CAHILL: And the indictment makes a preliminary hearing a moot matter.
“MR. APPELL: But Statute 15-11-1 [Code of Alabama 1975 § 15-11-1], I think, says on timely demand a preliminary hearing shall be given.
“THE COURT: Well, I’m going to deny the motion for a preliminary hearing. So, at least you will preserve it in the record.”
Appellant concedes that the position taken by him has been decided adversely to him in Nobis v. State, Ala.Cr.App., 401 So.2d 191 (1981), writ denied, 401 So.2d 204, and Duncan v. State, Ala.Cr.App., 369 So.2d 885 (1979). However, he urges that this “Court re-evaluate its position and adopt the reasons as set forth by Judge Bowen in his dissenting opinions” in the cited cases. Neither the record proper nor the court reporter’s transcript affords a sufficient basis for appellant’s request in this particular, for the reason that it appears that no written demand or motion for a preliminary hearing was ever filed in the Circuit Court, the only court that ever had jurisdiction of the case against the defendant. The indictment was returned on July 13, 1981. According to appellant’s brief, “The Appellant was arrested on July 13, 1981, for the offense of murder with bond set in the amount of Fifty Thousand Dollars.” Although there is no copy of any motion or demand for a preliminary hearing included in the record proper or the court reporter’s transcript of the proceedings, the transcript indicates that such a motion was filed on July 24, 1981, but that it was filed in the District Court and never filed with the Circuit Court. We take it that when the trial court stated in the hearing on January 29, 1982, “Well, I’m going to deny the motion for a preliminary hearing” it was referring to the oral motion just presented by defendant’s counsel on January 29, 1982. As to this ruling, the only ruling on the subject, the trial court was not in error.
The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur.