A jury found appellant guilty of an assault with intent to murder Jerry Wyant. The court fixed his punishment at fifteen years imprisonment and sentenced him accordingly.
As no contention is made on appeal as to the sufficiency of the evidence to support the verdict, no lengthy discussion of the evidence is necessary. A large number of witnesses testified in the case, but the gist of the evidence as to the guilt of defendant is to be found in the testimony of the alleged victim and the testimony of defendant himself.
According to the testimony of the alleged victim, he had gone to a business meeting at the Holiday Inn in Monticello, Indiana, on the night of September 12, 1978, and as he was returning from the meeting to the parking lot of the hotel at approximately 10:00 or 10:15 that night and was in the process of getting into his automobile, a man came up to him with a shotgun in his hand and told him to get in the back seat with him. At that time another male and a female entered the front seat of the automobile; the male, undisputably identified as the appellant herein, taking the driver's seat. The victim described each of the other three as "black." The automobile, with its four occupants and defendant as its driver, proceeded south on Interstate 65, pulled off the road at an exit and stopped. The two males placed the victim in the trunk of the automobile, after throwing some things out of the trunk. He was left in the trunk with his hands tied until the next morning. He could hear the car radio from the trunk and learned that the end of the trip was in Birmingham, Alabama.
The two persons in the automobile in addition to appellant and Wyant were Walter Gray and Geraldine Harris. The three lived at or near the Kingston Housing Project in Birmingham. The other undisputed evidence disclosed that defendant was seventeen years of age at the time, that Gray was about twenty-eight, and that the female was evidently older than either of the two males, as she was the mother of a girl friend of the defendant.
The victim further testified that some time after the automobile arrived in Birmingham, the trunk was opened and he saw both men. He was questioned by them as to the use of his credit cards. He said ". . . they told me to keep quiet or they would kill me." With the victim still in the trunk, the two males drove the automobile around in the Birmingham area for the next three or four hours. About 12:30 P.M. that day, the automobile was stopped again and he was taken out of the trunk. His feet were tied together, his hands were tied behind his back, and he was gagged. He saw the shotgun again at that time; it was a sawed-off shotgun. Gray, not the defendant, had the shotgun. He was hit in the shoulder by one of the men; one of them also hit him twice with an unidentified object; then one of them fired the shot, "the shotgun blast." He stated that the two men then proceeded to drag him away on his stomach, to cover him up with trash, and leave. Soon after they left, he untied himself and went to the highway, *Page 908 
where a deputy sheriff stopped within a few minutes. The witness was taken to a hospital, where he remained for fifteen days and was treated for the injury from the shot of the shotgun shell that penetrated the shoulder area of his back.
According to the testimony of defendant, Gray and Geraldine Harris made arrangements with defendant to have him go with them to Indiana so that defendant could "help them drive Geraldine to visit her father." They had some accidents on the way up but eventually arrived at the Holiday Inn in Monticello, Indiana, about 8:30 or 9:00 P.M. They were unable to get a room at the hotel because they didn't have money to pay in advance. They returned to the parking lot. They saw a state trooper nearby, and Gray told them to hide. According to his further testimony:
 "A. Geraldine asked him why should we hide and he told her that they were looking for us for the credit card that he had.
 "Q. What happened after you were under the car and Geraldine was under the car and Gray, you don't know where he was, what happened next?
 "A. About 30 seconds later I heard Gray tell someone to shut up and get in the car. So I looked from under the car and I saw him with a shotgun on a man.
"Q. Prior to this had you ever seen that shotgun?
"A. No, sir.
 "Q. Do you have any idea where Gray got the shotgun from?
"A. No, sir.
"Q. What happened next?
 "A. I peeked my head from under the car and Gray told me to get from under the car and told Geraldine to come here. So the man, he had already made him get into the car.
 "Q. Could you tell whether or not the man's car doors were open or not?
 "A. Yes, sir. It was closed at the time I got from under the car.
"Q. What happened next?
 "A. So he told us to come on and she said I don't want to go and so I said, I'm not going either. So he waved the gun around in our direction and he told us, he said you'd better come.
"Q. Did he point it at you or just wave it?
"A. He waved it."
Defendant's further testimony substantially corroborated the testimony of the victim as to what happened thereafter, except that defendant was positive that during the entire trip to Birmingham in the victim's automobile defendant was acting in fear of Gray, that he took no part in the matter of shooting Wyant, or otherwise assaulting him. He denied that he threatened Wyant.
Diligent counsel for appellant, the same counsel appointed to represent him in the trial court, argues comprehensively that defendant was denied due process in the trial court and deprived of other constitutional rights in being tried without the attendance in court of Walter Gray and Geraldine Harris. He supports with ample authority that an indigent defendant has the same right as a solvent defendant to "a fair and impartial trial." He says that the court erroneously refused "to aid the defense in procuring" material witnesses, particularly Walter Gray who at the time of the trial in this case was in custody of federal authorities out of the state of Alabama. He says also that the trial court erroneously overruled defendant's motion for a continuance.
On the day the trial of the case commenced and after the jury had been selected, defendant's counsel made known to the court that he had subpoenaed two witnesses, whom he referred to as "two co-defendants" who were not present. According to the record:
 "THE COURT: Are these two people in the penitentiary system of Alabama?
 "MR. JOHNSON: No, sir. Geraldine Harris is in the Federal Penitentiary in West Virginia. She's been convicted of kidnapping in this case. Gray, I don't know where he is. I know the Feds took him up there to try him and the jail tells me he hasn't been returned from federal custody. He's still got four cases pending with us. *Page 909 
 "THE COURT: Let me say this on the record. I was in fact wrong in allowing the defense to challenge people over sixty-five years of age and I'm sorry that I did that . . .
 "MR. JAFFE: I wouldn't have done it if I didn't think that was the law. I would like to make the same apology. Pertaining to my last objection we would like to know that this is on the record. I understand that the court is in no position . .
 "THE COURT: I didn't know about it until right now. Have they indicated a willingness to testify in this case?
 "MR. JAFFE: I haven't been able to speak to them. I don't even know if one of them has a pending case in the county or not.
 "MR. JOHNSON: Walter Gray has four cases pending. Geraldine Harris does not have any.
"MR. JAFFE: One of them out of this transaction?
"MR. JOHNSON: One of them out of this transaction.
"THE COURT: Where is he now?
 "MR. JOHNSON: Judge, according to the jail the Federal Government borrowed him to try him for kidnapping in Indiana. They did not charge this Defendant because of his age. They charged Geraldine Harris and Walter Gray with kidnapping. I know she's been tried and convicted. I don't know if he has been or not. I know he has not been returned by the Feds.
 "MR. JAFFE: I wrote the prosecutor in Indiana a letter requesting the whereabouts of the witness. He responded to me and said that Walter Gray should be in Alabama waiting State charges. His presence in the Northern District of Indiana was secured by writ of habeas corpus. Of course, this is just what his office says. He is an assistant United States attorney in Indiana. Could I enter that letter?
"THE COURT: Yes.
"[Thereupon the letter was received in evidence]
"MR. JAFFE: We are asking for the Rule."
On the morning of the trial and before the jurors from whom a jury to try the case was to be selected were brought to the courtroom, the following occurred:
 "MR. JAFFE: Yesterday I mentioned to you just as we finished the Motions around 12:30 or so that we were moving for a continuance and that the Defendant wasn't here and you said we needed this on the record and you allowed me leave to do so today, based of course on the previous discussions that we have had concerning discovery and the inability to get ready for trial.
"THE COURT: Overruled.
"MR. JAFFE: Thank you, Judge."
The record and the transcript of the proceedings show that on the day before the trial commenced there was a hearing of three pretrial motions of defendant, including a motion to compel disclosure. The motion contained nine separate categories of matters to be produced, and in the tenth part defendant prayed "for any other relief to which he may be entitled." The court made definite rulings as to each of the nine specific groups. It affirmatively appears that defendant had no basis for any complaint as to any of said rulings, that he had been furnished or would be furnished with all matters called for by the motion to produce that were insisted upon by defendant on the hearing.
We do not find in the transcript of the proceedings any definite invocation by defendant of a ruling by the trial court "to aid the defense in procuring" material witnesses in custody of federal authorities out of the state of Alabama. We find that the remark of counsel for defendant that appellant refers to as a motion for continuance made on the morning of the trial "based of course on the previous discussions that we have had concerning discovery and the inability to get ready for trial," was too nebulous to invoke a continuance by the trial court on the ground that either Walter Gray or Geraldine Harris was not in attendance. Furthermore, it is our opinion that if *Page 910 
in overruling defendant's motion, the trial court considered that the matter now raised on appeal was presented to it, its action in overruling the motion was not error. There was no semblance of any showing that the testimony of either of them would have been of benefit to defendant. There is nothing to indicate that either would have voluntarily testified, or that the refusal by either of them to testify on the ground of the self-incriminatory nature of the testimony would not have been upheld.
Sergeant Paul Crouch, a deputy sheriff who arrested Walter Gray on September 20, 1978, in connection with the crime involved in the instant case, was called by the defendant as the first witness after the state had rested. After a few preliminary questions, counsel for defendant stated:
 "We would like the Court to allow the defense to cross examine this witness. It is obvious that he is not my witness. He was the chief investigator in this case and I can show hostility if you want me to."
The court replied, "We will just play it by ear." After several pages of his testimony, the record shows:
"Q. You led the investigation, didn't you?
"A. Yes, sir.
 "Q. Do you recall when my office called you concerning this case?
 "MR. JOHNSON: Judge, I am going to object to that as to when his office called Sgt. Couch.
"THE COURT: I don't know what you have reference to.
 "MR. JAFFE: As I cross examine the witness I am showing hostility . . .
 "THE COURT: You can't cross examine your witness on a question of bias like that.
 "Q. Was Geraldine Harris arrested at the same time that Walter Gray was?
"A. Arrested the same day, yes sir."
Based on this quotation from the record, appellant argues that "the Court emphatically denied Appellant's request and proffer to cross-examine Sgt. Couch, to show hostility and to show bias." It appears that appellant confuses a right "to cross-examine" in an effort "to show bias" with one's right on direct examination of an unwilling or hostile witness to ask him leading questions.
 "We have discussed in a previous subsection that a party may not discredit his own witness by showing bias of a witness in favor of the party's opposition. It is proper, however, for the trial court to permit a party to elicit testimony from his own witness, indicating bias in favor of the opponent, where the avowed purpose of such testimony is to invoke the discretion of the court in allowing leading questions to the witness. It should be noted that the Alabama Rules of Civil Procedure make it a matter of right for a party to interrogate any unwilling or hostile witness by leading questions." Gamble, McElroy's Alabama Evidence, (1977), § 165.01 (8).
There is nothing in the action of the trial court shown above that offends the principle stated by Judge McElroy.
Appellant asserts that failure of the District Court prior to any indictment to conduct a preliminary hearing on motion of defendant amounted to a failure to comply with the requisites of due process. It appears that before any indictment was returned there had been a setting of defendant's preliminary hearing on November 13, 1978, but in the meantime an indictment had been returned. Upon defendant's appearance, accompanied by his counsel, on November 13, 1978, the District Court announced that the defendant had already been indicted and for that reason would not be given a preliminary hearing. Within a few days, defendant filed in the Circuit Court a motion for a preliminary hearing or, in the alternative, to quash the indictment because his request for a preliminary hearing had been denied. This motion was continued by one of the judges of the Circuit Court, not the judge trying the case, to December 28, 1978. It was not presented again until the day before the trial, at which time it was denied by the judge trying the case. *Page 911 
A defendant is not entitled to a preliminary hearing as a matter of right after an indictment has been returned. Odom v.State, Ala.Cr.App., 356 So.2d 242, 246 (1978); Johnson v.State, Ala.Cr.App., 335 So.2d 663 (1976), cert. denied, Ala.,335 So.2d 678. Furthermore, a preliminary hearing is not necessary to satisfy the requisites of due process. Scaife v.State, Ala. Cr.App., 337 So.2d 146 (1976).
Upon defendant's arrest, he was placed in "juvenile custody," where he was afterwards held to be incorrigible and transferred from the custody of the juvenile court to be treated otherwise than as a juvenile by the District Court and the Circuit Court. He applied for treatment as a Youthful Offender, but his application was denied. On the trial of the case, the State was allowed to prove over objection of defendant, that, while the officers were in the process of attempting to arrest the defendant in defendant's mother's house, defendant ran out the back door and that while defendant was in "family court" he escaped. Appellant says, as to the usual rule that the flight of an accused can be shown in evidence against him on the issue as to his guilt, there is an exception as to a juvenile accused while being proceeded against as a juvenile under the juvenile jurisdiction of courts. He relies upon Code of Alabama 1975, § 12-15-67:
 "Unless advised by counsel, the statements of a child or other information or evidence derived directly or indirectly from such statements made while in custody to police or law enforcement officers or made to the prosecutor or probation officer during the process of the case, including statements made during a preliminary inquiry, predisposition study, informal adjustment or consent decree, shall not be used prior to a determination of the petition's allegation in a delinquency or in need of supervision case or in a criminal proceeding prior to conviction."
The quoted statutory restriction was upheld and applied inWatts v. State, Ala.Cr.App., 361 So.2d 1200 (1978). We are cited to no authority and given no good reason why a particular statutory provision should be extended beyond its clear language and obvious purpose so as to preclude the application of the usual rule of the admissibility of evidence of the flight of an accused, as to which the strength or weakness of the evidence is dependent upon all the circumstances, including faculties of an accused normally affected by his age and the extent of his experience.
After deliberation and upon the return of the jury with a verdict, the following occurred:
 "THE COURT: . . . Sir, has the jury reached a verdict?
"FOREMAN: Yes, sir.
"THE COURT: Is it unanimous?
"FOREMAN: Yes, sir.
"THE COURT: Please read it.
 "FOREMAN: We, the jury, find the defendant guilty of conspiracy to assault with intent to commit murder as charged in the indictment.
 "THE COURT: That word conspiracy, did you write that word in there?
"FOREMAN: Yes, sir.
 "THE COURT: Of course, we have abolished, I charged you that a person who is guilty of conspiracy is guilty of the offense. The proper verdict form would be that you find him guilty without writing anything in it, as charged in the indictment. Is that your verdict?
"FOREMAN: Yes, sir.
 "THE COURT: Do you find the defendant guilty of assault with intent to murder?
"FOREMAN: Yes, sir.
"THE COURT: As charged in the indictment?
"FOREMAN: As charged in the indictment.
 "THE COURT: I am going to ask each and everyone of you if that is your true verdict form.
 "(Thereupon, the Court polled the jurors, asking each and every juror if that was his or her individual verdict, each juror answering in the affirmative that it was his or her individual verdict. The following proceedings were then had and done:) *Page 912 
 "THE COURT: Does anyone disagree with that verdict of guilty of assault with intent to commit murder?
 "(Thereupon, the jurors were sent back into the Jury Room, after which the following proceedings were had and done:)
"MR. JAFFE: We object to the form of the verdict.
 "(Thereupon, the defendant, counsel for defendant and counsel for the State stood before the bench, after which the following proceedings were then had and done:)
"THE COURT: You have heard the verdict?
"DEFENDANT: Yes, sir.
 "THE COURT: I will read it to you. It says we, the jury, find the defendant guilty of assault with intent to murder as charged in the indictment. In accordance with that jury verdict I will find you guilty of assault with intent to commit murder and I will pass the case until March 1, at 2:30 P.M."
On March 1, 1979, at 2:30 P.M., just before the court fixed defendant's punishment and sentenced him, he was asked if he had anything to say, and he replied, "No, sir." The court then asked defendant's counsel if he had anything to say, and he stated:
 "Yes, sir. Very shortly, I believe that the indication on the jury verdict when they came back and wrote in a conspiracy — of course that means he is guilty under the indictment, but I think in any case that the jury believes for the most part that — the length of time that they were out, that Brad wasn't the one that shot him, and I believe that. And I would ask for the Court to consider that and his age. I mean, it's much less his part than Gray's."
Thereafter the court said:
 "The jury did go out of their way, I think, and were correct to tell me that they didn't believe he pulled the trigger that shot the man. And although he has had trouble most of his life, given his parents all kinds of problems. Ordinarily, it is a 20 year case, and I am going to take into consideration the fact that — what the jury wrote in and give him a small break.
 "It is the judgment and sentence of the court that you be imprisoned in the penitentiary for a term of 15 years."
Appellant cites a number of cases in which it was held that there was error in the court's changing the language of a jury's verdict. We do not deem it necessary to here discuss all of these cases. They are distinguishable from the instant case, in which it is clear that each and every juror agreed on a verdict that defendant was guilty of assault with intent to murder. We think it probably would have been better for the court to have sent them back to the jury room with definite instructions that the only appropriate verdicts they could render were as the court had previously charged them:
 "We the jury find the defendant guilty of an assault with intent to murder as charged in the indictment, we the jury find the defendant guilty of an assault and battery as charged in the indictment, or we the jury find the defendant not guilty."
However, in the absence of any question as to what the jury found by its verdict, there was no error prejudicial to defendant in the way the matter was handled by the trial court. Furthermore, as noted above, not even defendant or defendant's counsel had any doubt as to what all the jurors agreed upon and stated by the verdict. The court had comprehensively and clearly instructed the jury as to the criminal responsibility of an accomplice, one who has aided or abetted another who actually commits the felony. The record shows that upon questioning by the jury, the word, "conspiracy," was used both by the jury and by the trial court as applicable to the law of the liability of one who is not actually the principal but aids and abets the principal. The insertion of the words, "conspiracy to," in the form of the verdict, which complied with the instructions to the jury, did not injure defendant. It proved to be a boon to him that resulted in his getting only three-fourths of a sentence that he would have otherwise received. This his counsel fully realized *Page 913 
and utilized to defendant's benefit in his argument to the court. Justice has been served by the incident, and appellant has no basis for a complaint.
We find no error in the record prejudicial to the defendant. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court. The judgment of the trial court is hereby
AFFIRMED.
All the Judges concur.